Irving RAVENS, Robert W. Benzinger and Steve Wildt, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Syed H. IFTIKAR, Michael J. Perez, David I. Caplan, Eugene Berti, Kenneth S. Hardesty, Thomas Lyman Chun, J. Brent Nilson, and Syquest Technology, Inc., Defendants.

Vito BELLEZZA and Frank A. Fideli, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Syed H. IFTIKAR, Michael J. Perez, David I. Caplan, Eugene Berti, Kenneth S. Hardesty, Thomas Lyman Chun, J. Brent Nilson, and Syquest Technology, Inc., Defendants.

Nos. C–96–1224–VRW, C–96–1926–VRW.

United States District Court,
N.D. California.

Jan. 7, 1997.

Order Denying Reconsideration
July 16, 1997.

---

1. To the extent the appropriate standard of review is de novo, I have conducted a de novo review.

Richard S. Schiffrin, Schiffrin & Craig, Ltd., Bala Cynwyd, PA, Paul F. Bennett, George S. Trevor, Patricia A. Szymowski, Gold, Bennett & Cera, L.L.P., San Francisco, CA, Nadeem Faruqi, Faruqi & Faruqi, L.L.P., New York City, Howard D. Finkelstein, Jeffrey R. Krinsk, Finkelstein & Associates, San Diego, CA, Reed R. Kathrein, Lisa C. Atkinson, Milberg, Weiss, Bershad, Hynes & Lerach, L.L.P., Curtis V. Trinko, Law Offices of Curtis V. Trinko, L.L.P., New York City, I. Stephen Rabin, Mark W. Gaffney, Jacqueline Sailer, Rabin & Peckel, New York City, Lawrence G. Soicher, Law Offices of Lawrence G. Soicher, New York City, for Plaintiffs.

Bruce G. Vanyo, Douglas J. Clark, Cynthia A. Dy, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, for Defendants.

### ORDER

WALKER, District Judge.

These actions are subject to the amendments of the federal securities laws, enacted in the Private Securities Litigation Reform Act of 1995 (the "Reform Act" or "Act"), Pub. L. No. 104–67, 109 Stat. 737. By this enactment, Congress sought to remedy major flaws in private securities litigation. Senate Rep. No. 104–98, 104th Cong., 1st Sess., 1996 U.S.C.C.A.N. 679. The principal flaw Congress perceived was the disproportionate influence lawyers have exerted over securities class actions:

> The initiative for filing 10b–5 suits comes almost entirely from lawyers, not genuine investors. * * * Even worse, investors have great difficulty exercising any meaningful direction over the case brought on their behalf. The lawyers can decide when to sue and when to settle, based largely on their financial interests, not the interests of the purported clients.

*Id.* at 685.

Seeking to "transfer primary control of private securities litigation from lawyers to investors," *id,* Congress amended Title I of the Securities Act of 1933, 15 U.S.C. § 77a et seq, and Title I of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. Among other changes, these amendments established new procedures for selecting a lead plaintiff and counsel to represent a class in federal securities class actions.

The Reform Act imposes a notice requirement on plaintiffs seeking to represent a class of investors requiring them to publish notice of "the pendency of the action, the claims asserted therein, and the purported class period." 15 U.S.C. §§ 77z–1(a)(3)(A)(i)(I) & 78u–4(a)(3)(A)(i)(I). The purpose of this is to enable investors to intervene in the litigation and take charge of it by, among other things, selecting the lawyers to represent the class and setting the terms of their compensation.

Congress did not, however, require that this notice be subject to scrutiny and approval by the court before its publication. Nor did Congress make any provision for the situation which these cases present: namely, a notice which is inadequate to apprise investors of the claims asserted so that those who may wish to do so have a fair opportunity to intervene and assume control of the litigation.

### I

The instant securities class actions were brought on behalf of a class of purchasers of Syquest Technology, Inc ("SYQT") stock during the period October 21, 1994, through February 2, 1996, shortly after the price of SYQT had fallen dramatically on the NASDAQ national market. The lawyers heading up both class actions are prominent "entrepreneurial" lawyers that specialize in, and have long dominated, securities class action practice.[1] Representing the *Bellezza* plain-

---

1. For instance, the Milberg firm enjoys a very large share of the securities class action practice throughout the United States. "They've Cornered the Market," Nat'l LJ, Apr 27, 1992, at 1.

tiffs are Gold, Bennett & Cera, LLP; Rabin & Garland; and Kenneth A. Elan. The *Ravens* plaintiffs are represented by Milberg, Weiss, Bershad, Hynes & Lerach; Schiffrin & Craig; and Lawrence G. Soicher. The *Ravens* plaintiffs have filed a motion to be appointed lead plaintiffs and for consolidation pursuant to section 21D(a)(3)(B) of the Act. As a prerequisite to this motion, they published notice purportedly in compliance with subparagraph (A) or section 21D(a)(3). Id at in compliance with subparagraph (A) or section 21D(a)(3). Id at 4. The adequacy of that notice is the subject of this order.

## A

The requirement that notice be given to class members of an action under FRCP 23(b)(3) is one of constitutional dimension. See *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *In re Gypsum Antitrust Cases*, 565 F.2d 1123 (9th Cir.1977). This constitutional minimum has historically been satisfied if notice was afforded before the court adjudicated the rights of absent class members. By enactment of the Reform Act, Congress appended a further statutory requirement of notice at the very outset of the litigation. See §§ 27 and 21D of the Securities Exchange Acts of 1933 and 1934, 15 U.S.C. §§ 77z–1(a)(3)(A)(i)(I) & 78u–4(a)(3)(A)(i).

■ Under these identical provisions of the Reform Act, a plaintiff seeking to represent a class of investors:

> Shall cause to be published in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported class—
>
> (I) of the pendency of the action, the claims asserted therein, and the purported class period;
>
> (II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.

Although the Reform Act does not specifically define the required notice, it must minimally contain the three elements described in the above provision: (1) "pendency of the action;" (2) "claims asserted therein;" and (3) "purported class period." The first and third of these elements are relatively straightforward; the plaintiff must state that a class action is pending and he must specify the dates of the class period. The second element is far less clear.

"Claims asserted therein" might refer to the nature and character of the class action or, alternatively, it might simply require a recitation of the statutory basis for the suit. To decide which of these constructions Congress intended, the court must consider the legislative history of the Act and the interpretations which courts have given such language in analogous contexts.

## B

The overriding goal of the Reform Act is to displace figurehead plaintiffs with real investors in securities class actions. See Senate Rep. No. 104–98, 104th Cong., 1st Sess., 1996 U.S.C.C.A.N. 679, 685. To do this, Congress replaced the antiquated practice of selecting representative plaintiffs by "the race to the courthouse" with a more rational selection system. *See id.* at 689. Under the new system, it is expected that the most adequate representative of the class will emerge from a competition among all qualified investors. To ensure that all such investors make an informed decision whether to throw their hats into the ring, Congress implemented the notice requirements of sections 27 and 21D.

The notice provisions are only effective, however, if qualified investors are notified of the nature and character, not just the existence, of the claims asserted. An investor can only make an informed determination whether intervention appropriate to protect his interests if he is provided information describing the legal and factual basis of the claims. A mere recitation of the statute, or statutes, under which the claim is brought is simply inadequate to give an investor the information necessary to make the decision to intervene or not.

An appropriate analog for what the Reform Act requires is the notice that has historically been required under Rule 23 of the Federal Rules of Civil Procedure. Rule 23(c)(2) mandates that, prior to class certification, the named plaintiff must provide po-

tential class members with "the best notice practicable under the circumstances." The basic purpose of this notice requirement is to "present a fair recital of the subject matter of the suit and to inform all class members of their opportunity to be heard." *In re Gypsum Antitrust Cases,* 565 F.2d 1123, 1125 (9th Cir.1977). In furtherance of this goal, the Fifth Circuit set forth the following standard for Rule 23(c)(2) notice:

> Not only must the substantive claims be adequately described but the notice must also contain information reasonably necessary to make a decision to remain a class member and be bound by the final judgment or opt out of the action. The standard then is that the notice required by subdivision (c)(2) must contain information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment.

*In re Nissan Motor Corp. Antitrust Litigation,* 552 F.2d 1088, 1104–05 (5th Cir.1977); see also *In re Domestic Air Transportation Antitrust Litigation,* 141 F.R.D. 534, 553 (N.D.Ga.1992) ("Notice must not only reach the affected parties, but it must also convey its message in a meaningful way."). A qualified investor considering whether to challenge the named plaintiffs for lead plaintiff designation will need at least this much information to make a rational decision whether to commit the resources necessary to represent the class.

Similar concerns guide the courts in their evaluation of the notice required for class action settlement agreements. Under FRCP 23(e), courts require parties to settlement agreements to notify the public of the "claims asserted therein," which includes the "nature of the pending action." See *Maher v. Zapata Corp.,* 714 F.2d 436, 451 & n. 26 (5th Cir.1983); *Scholes v. Stone, McGuire & Benjamin,* 839 F.Supp. 1314, 1320 (N.D.Ill.1993). "Notice in a class suit must present a fair recital of the subject matter and of the proposed terms * * *." *Miller v. Republic National Life Ins. Co.,* 559 F.2d 426, 429 (5th Cir.1977). Such detailed notice is necessary to "provide[ ] the shareholders with sufficient information for them to make a 'rational decision whether they should intervene in the

settlement approval procedure.'" *Id.* at 451, quoting Wright & Miller, Federal Practice & Procedure: Civil § 1839 (1972). Since the court presumes that Congress was aware of these judicial interpretations of "claims asserted therein" when it enacted the Reform Act and since qualified investors need such information at the lead plaintiff designation stage to make a rational decision whether to intervene, the court concludes that sections 27 and 21D require plaintiffs, either in the published notice or the complaint, to provide other shareholders with notice of the nature and character of the claims asserted in the class action.

## II

### A

■ With these principles in mind, the court will consider the adequacy of the notice provided by the plaintiffs in this case. In its entirety, the published notice reads:

> TO: All purchaser of SyQuest Technology, Inc. common stock during the period October 21, 194 to February 1, 1996
>
> On April 2, 1996, a class action, *Ravens, et al. v. Iftikar, et al.,* C–96–1224–VRW, was filed in the U.S. District Court for the Northern District of California, which asserts claims for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934. Any member of the proposed class may move the Court to serve as lead plaintiff no later than 60 days from the date of this Notice. For more information contact William S. Lerach, Milberg Weiss Bershad Hynes & Lerach LLP, 619/231–1058.

Such cursory notice does not comply with section 21D of the Securities Exchange Act of 1934. There is no explanation of the legal theory underlying plaintiffs' suit; no discussion of who violated the Securities Exchange Act of 1934; and no description of the alleged wrongdoing that forms the basis of the complaint. In short, the notice does not provide shareholders with sufficient information to make a rational decision whether to intervene in the suit.

Nor is this defect cured by the invitation in the notice to call the lead lawyer at his office for more information. That lawyer has an incentive to discourage, rather than foster,

investor competition. See Elliott J. Weiss & John S. Beckerman, Let the Money do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions, 104 Yale LJ 2053, 2099–2100 (1995). Without a public record of what is communicated, courts cannot simply assume that plaintiffs' lawyers will give an impartial and objective description of the nature and character of the claims asserted in the suit. The court would be shirking its responsibility to putative class members if it deemed such "behind-the-scenes" notice to be adequate. Cf *Gold Strike Stamp Co. v. Christensen,* 436 F.2d 791, 799 (10th Cir.1970) ("[Rule 23] places control of class actions and in particular the issuance of notice to members of the class under the control and thus the discretion of the trial judge."). Under these circumstances, the court cannot deem the notice published by the *Ravens* plaintiffs to be adequate.

**B**

■ A diligent investor, however, will not place sole reliance on the published notice to learn all the information necessary to make an informed decision to intervene. Where the notice itself is deficient, a rational investor might decide to inspect the courthouse files to ascertain the legal and factual basis for plaintiffs' complaint. See, e.g., *Valerio v. Boise Cascade Corp.,* 80 F.R.D. 626, 636 (N.D.Cal.1978) (finding notice adequate, in part, because it noted that all documents were available for inspection at courthouse).

In this case, however, the diligent investor would be stymied in his efforts because he would be met with verbose, amorphous and confusing complaints. The complaint filed by the *Ravens* plaintiffs contains over fifty-five pages of painstakingly detailed allegations of evidentiary facts. The *Bellezza* complaint rings in at just under forty pages of turgidity. Such complaints contribute to the "plague of burdensome and prolix complaints that have become fashionable in securities fraud cases today." *In re GlenFed, Inc. Securities Litigation,* 42 F.3d 1541, 1555 (9th Cir.1994) (Nelson, J., concurring). They are so distended and prolix that an investor who

obtained copies of the pleadings would not be able to divine the legal and factual basis of plaintiffs' claim. Such notice is not the best practicable under the circumstances. See *In re Domestic Air Transportation Antitrust Litigation,* 141 F.R.D. 534, 553 (N.D.Ga. 1992); see also Senate Rep. No. 104–98, 104th Cong., 1st Sess., 1996 U.S.C.C.A.N. 679, 691 (citing with approval advice of lawyer that "settlement notices provided to class members are often obtuse and confusing, and should be written in plain·English"). For these reasons, the court finds that the plaintiffs have not satisfied the notice requirements of the Reform Act, and these cases may not proceed as class actions at this time. Presumably, plaintiffs will seek to correct the deficiencies of the notice given. To that end, the court will conduct a case management conference on a date to be arranged by the clerk.

**III**

Plaintiffs have made an ex parte request for expedited discovery in support of their motion to freeze certain of defendants assets. The court will DEFER ruling on this request pending further proceedings.

Similarly, in light of the concerns discussed above, the court DECLINES to refer this case at this time to a magistrate judge to broker settlement discussions.

**IV**

For the reasons stated above, the court ORDERS as follows:

The *Ravens* plaintiff's motion to be appointed lead plaintiff pursuant to § 21D(a)(3)(B) of the Act is DENIED without prejudice.

IT IS SO ORDERED.

Plaintiffs' counsel in these cases seek to represent a class of purchasers of SyQuest Technology, Inc, common stock ("SYQT"). To that end, counsel in C–96–1224 (*Ravens* ) published a notice of this litigation on April 10, 1996, in the *Wall Street Journal.* The notice failed to describe important aspects of the action or the qualifications of the named plaintiffs to lead it.[1] Because this failure

---

1. In its entirety, that notice reads as follows:

TO: All purchasers of SyQuest Technology, Inc. common stock during the period October 21, 1994 to February 1, 1996

renders class members unable to discern from the notice their interest in the litigation and whether they should opt out, intervene or take other steps, the court found the notice inadequate and declined to designate the Ravens group lead plaintiffs. Order, January 7, 1997. Counsel ask for reconsideration.[2]

Subparagraph (A) of section 21D(a)(3), a provision of the newly enacted Private Securities Litigation Reform Act of 1995, Pub. L. No. 104–67, 109 Stat. 737, amending portions of the Securities Exchange Act of 1934, 15 U.S.C. § 78u–4(a)(3), together with principles developed under FRCP 23, govern notice in this litigation. Notice is a prerequisite to designation of a "most adequate" or lead plaintiff. See 15 U.S.C. § 78u–4(a)(3)(B)(i). Reform Act notice is straight-forward. "This notice must identify the claims alleged in the lawsuit and the purported class period and inform potential class members" of their right to intervene in the litigation. House Conf. Rpt. No. 104–369, 1995 U.S.C.C.A.N. at 732. In its January 7 order, the court did not discuss a press release Ravens counsel issued on the same day the notice ran or a press release on May 28, 1996, by the law firms which filed C–96–1926 (Bellezza ). These press releases ran on the Bloomberg Business News service. At a status conference on July 18, 1996, the court had referred to the pleadings as "very well drafted." Plaintiffs point to the press releases and this comment as grounds for reconsideration.

There are four reasons that the notice here is inadequate. First, the notice published in the Wall Street Journal and the lawyers' press releases are too sketchy to inform class members of the claims asserted in this litigation and the class' interest in it. Second, the notice fails to disclose plaintiffs' lack of qualifications to serve as class representatives and "unique defenses" that bar plaintiffs from maintaining an action for the class period claimed in the notice. Third, the pleadings fail to delineate when the alleged fraud began and multiple corrective statements make its ending unclear, rendering the notice essentially meaningless. Fourth, the notice fails to alert class members to actual and potential intra-class conflicts evident in the pleadings and which should be explored to inform class members' decisions whether to opt out, intervene or take other measures.

These reasons also bar consolidation of the complaints and designation of a lead plaintiff, at least until further proceedings. To move the litigation forward, and pursuant to its authority under subparagraph (A)(iii) of section 21D(a)(3) and FRCP 16 and 23 to require additional notice and pleading, the court directs counsel to afford further notice of the claims asserted in the complaints at bar, make appropriate amendments to those complaints, or both. What follows explains why this directive is necessary.

## I

For the reasons detailed in the court's January 7 order, which will not be repeated here, the notice published by the Ravens counsel in the Wall Street Journal was simply too cursory to comply with the notice requirements of subparagraph (A). So, too, are the press releases by the law firms representing the Ravens and Bellezza plaintiffs. Those press releases are so vaporous that the court did not understand that plaintiffs even considered them to constitute statutory notice under section 2tD(a)(3)(A)(I).[3] Furthermore, the pleadings to which the notice directs class members are themselves deficient.

On April 2, 1996, a class action, Ravens, et al. v. Iftikar, et al., C–96–1224–VRW, was filed in the U.S. District Court for the Northern District of California, which asserts claims for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934. Any member of the proposed class may move the Court to serve as lead plaintiff no later than 60 days from the date of this Notice. For more information contact [name of lawyer, law firm and telephone number].

2. Counsel for both sets of plaintiffs were on March 7, 1997, furnished a tentative version of this order and given an opportunity to comment on it. The court's responses to these comments have been integrated into this order.

3. The Ravens plaintiffs' request to be designated lead plaintiff refers only to the Wall Street Journal item as "notice."

## A

The generality of the notice description in section 21D(a)(3)(A)(I)(I) does not suggest that the Reform Act permits notice to be perfunctory, misleading or even uninformative. First, clause (iii) of section 21D(a)(3)(A) provides that the Reform Act notice "shall be *in addition* to any notice required pursuant to the Federal Rules of Civil Procedure." Notice standards under the Federal Rules, hence, are the baseline against which Reform Act notice must be evaluated. Reform Act notice requirements cannot reasonably be any less.

Second, the Federal Rules require "the best notice practicable under the circumstances." See FRCP 23(c)(2). Although Rule 23(c)(2) gives the court broad discretion, both the form and content of the notice must satisfy constitutional due process requirements. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 172–77, 94 S.Ct. 2140, 2150–52, 40 L.Ed.2d 732 (1974). The due process clause requires the notice to be "reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). "The notice should describe the action and the plaintiffs' rights in it." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812, 105 S.Ct. 2965, 2974, 86 L.Ed.2d 628 (1985). It must also provide the class members with "an opportunity to remove [themselves] from the class." *Id.*

Third, the Reform Act notice requirement must be read in light of its purpose. The Conference Committee report on the Reform Act amendments stated that objective:

> These provisions are intended to encourage the most capable representatives of the plaintiff class to participate in class action litigation and to exercise supervision and control of the lawyers for the class. These provisions are intended to increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel. The legislation also provides that all discovery is stayed during the pendency of any motion to dismiss or for summary judgment. These stay of discovery provisions are intended to prevent unnecessary discovery costs on defendants.

House Conf. Rep. No 104–369, 104th Cong., 1st Sess., 1996 U.S.C.C.A.N. 730, 731. This objective is unlikely to be achieved by perfunctory notice which fails to enlist qualified investors; still less-can this objective be served by a notice, such as the one here, that suggests absent class members can rely on the named plaintiffs to prosecute claims they would appear incapable of prosecuting.

Fourth, the adequacy of notice published under the Reform Act cannot be evaluated standing alone. The notice must be assessed in light of the pleading to which the notice is designed to alert investors. Where, as the court will describe later, the pleadings are inadequate to allege claims on behalf of the entire class or raise questions about potential conflicts among class members, then even a class member who seeks out and obtains the pleadings has not been afforded a fair opportunity to intervene or take other appropriate measures. The notice and pleadings must be considered together to satisfy the command and purpose of section 21D(a)(3)(A).

In this case, the *Ravens* plaintiffs' notice in the *wall Street Journal* is so skeletal that it tells investors only that a lawsuit has been filed and that the class spans a year and a quarter. The named plaintiffs are unidentified. Their qualifications to represent a class are not described. The lengthy and detailed allegations of the complaint are not summarized. Actual and potential obstacles to plaintiffs' representation of the entire class described in the notice and press releases are not disclosed. Finally, conflicts among groups within the class go unexplained.

To enable class members to decide whether to opt out, intervene or take other measures, the notice must be free of these deficiencies. The reasons why this information is essential are taken up at length in the following sections. Beforehand and because plaintiffs obviously also rely upon the press releases, a word about them is appropriate.

**B**

As noted above, the central purpose of the notice requirement of subparagraph (A) of section 21D(a)(3) is to enable the member of the putative class with the "largest financial interest in the relief sought by the class" to make a rational decision whether to intervene. See 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(bb). The press releases issued by plaintiffs' counsel are no more up to this task than the skeletal notice the *Ravens* lawyers dropped in the *Wall Street Journal.*

With respect to the fraudulent conduct at issue in this case, the press release by the *Ravens* law firms contains the following generalized statement:

> The complaint charges SyQuest and certain of its officers and directors with violations of the Securities Exchange Act of 1934 by making misrepresentations about SyQuest's business, operations, new products, earnings growth and financial statements and SyQuest's ability to continue to achieve profitable growth.

Tattersall Decl, Exhibit D. The *Bellezza* law firms' press release is no more substantive:

> The complaint * * * alleges that defendants participated in a scheme to artificially inflate SyQuest's common stock price in order to allow them to sell 324,398 shares of their SyQuest common stock.

*Id.,* Exhibit F.

The true character of the press releases as puff pieces for the plaintiff law firms is evident from the extensive portions that they devote to aggrandizing the lawyers' capabilities. The *Ravens* law firm describes itself in its press release thusly:

> The firm's reputation for excellence has been recognized on repeated occasions by courts which have appointed the firm to major positions in complex multi-district or consolidated litigations. [The law firm] has taken a lead role in numerous important actions on behalf of defrauded investors, and has been responsible for a number of outstanding recoveries which, in the aggregate, total approximately $2 billion.

*Id.* The press releases add virtually nothing to the informational content of the *Ravens* lawyers' *Wall Street Journal* notice which was woefully inadequate.

**C**

If paucity of information characterizes the notice and press releases, the pleadings feature bulk and prolixity. But despite the Reform Act's command to plead with particularity, 15 U.S.C. § 78u–4(b)(1) and (2), the pleadings shed little light. "A complaint can be long-winded, even prolix, without pleading with particularity. Indeed, such a garrulous style is not an uncommon mask for an absence of detail." *Williams v. WMX Technologies, Inc.,* 112 F.3d 175, 178 (5th Cir.1997). In this case, garrulousness veils plaintiffs' omission of their qualifications and "unique defenses" disabling plaintiffs from representing the class they claim to represent, as well as conflicts among the class that may require resolution.

Together, the *Ravens* and *Bellezza* complaints consist of almost one-hundred pages—about as far from the "short and plain statement of the claim" envisioned by FRCP 8(a) as a pleader can stray. These complaints contain lengthy and irrelevant speculation about the defendants' motivations. For instance, the *Bellezza* plaintiffs surmise:

> The Individual Defendants realized that SyQuest's attempt to enter into the SOHO removable storage market would fail, as SyQuest's EZ135 could not be produced and marketed at a profit at that time. Nevertheless, competitive pressures forced them to introduce the EZ135 before it had been completely developed to produce and sell at a competitive price. Also, since SyQuest had invested millions in component part inventories, and made large noncancelable purchase orders for components, to cancel the product introduction at that point would be an admission of management's failure and result in SyQuest's suffering huge and catastrophic write-offs, the collapse of its stock and the ouster of its top management team. Defendants proceeded with the EZ135 product introduction hoping that by creating market demand for that product by making false claims they could at least recoup SyQuest's large investment in the development of the product and hold onto some SOHO market

share, while developing a cheaper, more effective product.

*Bellezza* Compl. at ¶ 44. Not to be outdone, the *Ravens* plaintiffs allege:

> During March–April 1995, SyQuest stock price fell to as low as $10–5/8 per share. This price decline eliminated or virtually eliminated the value of the 1994 stock option grants to SyQuest's top officers and management employees, including the Individual Defendants. Also, criticism of Iftikar's and his management team's leadership of SyQuest was now so serious that they were in great danger of losing their jobs if SyQuest's corporate performance did not improve and its stock price did not go up.

*Ravens* Compl. at ¶ 55. Such speculation about defendants' motivations contains no information about the nature of the claims asserted.

To make matters worse, the complaints are replete with statements by the defendants that, due to their content, cannot possibly form the basis for a fraud-on-the-market claim. To illustrate, both complaints contain the following statements by SyQuest officers Perez and Everett:

> SyQuest Technology Inc. stands to gain plenty in revenues and market share from the enthusiastic reception, at least by Wall Street, of rival Iomega Corp.'s new internal disk-drive products, SyQuest executives said.
>
> "As people are getting involved in the Iomega story and looking at the competition they're becoming more aware of SyQuest," said Michael Perez, chief financial officer of SyQuest, in an interview. "We have superior technology."
>
> \* \* \* \* \* \*
>
> Dave Everett, executive vice president of SyQuest sales and marketing, said the EZ drive is beginning to appear in retail channels. "We'll be very aggressive in that market and we have every expectation we'll take a strong lead position."

*Bellezza* Compl. at ¶ 45; *Ravens* Compl. at ¶ 57 (emphasis omitted).[4]

---

**4.** All citations are to the *Ravens* complaint unless otherwise noted; the *Bellezza* complaint is sub-

Rather than false statements of fact, these are simply promotions by SyQuest officers of their company, much like the self-laudatory statements by plaintiffs' counsel in their press releases about this litigation. See *Eisenstadt v. Centel Corp,* 113 F.3d 738, 745 (7th Cir.1997) ("*Everybody* knows that someone trying to sell something is going to look and talk on the bright side. You don't sell a product by bad·mouthing it. \* \* \* The heart of a reasonable investor does not to begin to flutter when a firm announces that some project or process is proceeding smoothly") (emphasis in original).

Still more serious defects of the complaints, to say nothing of the notice or press releases, lie in their failure to allege the timing of, and market response to, defendants' alleged misstatements and omissions. Despite their mass of irrelevant verbiage and the obvious informational significance of price data for a fraud-on-the-market case, the complaints at bar make only selective reference to SYQT price behavior.

The charts on page 8 of the *Ravens* complaint are, at best, unhelpful in this respect. Although one of the charts purports to identify SYQT's price movements during times of some of the insider sales alleged in the complaint, neither chart specifically points out SYQT's price behavior at the times of the omissions and misstatements alleged in the complaint. Neither chart coincides with the class period alleged in the complaint.

Plaintiffs' failure to furnish this information, if not a neglect of their responsibilities under 15 U.S.C. § 78u–4(b)(1), seems at least curious. First, such information plays a central role in a fraud-on-the-market securities class action. Second, securities price information is readily available; for example, Westlaw reports historical securities price and volume data on-line. To assist it in analyzing the adequacy of the notice and pleadings here, the court has downloaded from Westlaw and compiled in the appendix to this order the high, low, close and volume of trading in SYQT from August 26, 1994, nearly two months before commencement of

stantively the same, a slightly abridged version.

the class period, to June 24, 1996, the ninetieth trading day after the end of the class period. See 15 U.S.C. § 78u–4(e).

The court takes judicial notice of these data. FRE 201(c); *SEC v. Bilzerian,* 814 F.Supp. 116, 123 (D.D.C.1993), aff'd. 29 F.3d 689 (D.C.Cir.1994) ("The Court may take judicial notice of closing stock prices"). The court also takes judicial notice of the performance of the NASDAQ Composite Index, reflecting general market conditions during the same period and downloaded these data, too. Cf *Fasolino Foods Co v. Banca Nazionale del Lavoro,* 761 F.Supp. 1010 (S.D.N.Y. 1991), aff'd. 961 F.2d 1052 (2d Cir.1992) (Dun & Bradstreet's financial ratings are matters beyond reasonable dispute). For comparative purposes, the court has calculated a daily class period index of the change in SYQT's closing prices relative to the composite, using October 20, 1994, the day preceding the start of the class period, as the base.[5] The index appears in the last column of the appendix ("SYQT: NASDAQ").

The complaints likewise fail to allege what plaintiffs contend was the true value of SYQT during the class period. In a fraud-on-the-market case, the claim of true value defines the class, for implicit in any definition of the class period is an assumption of what the security's value would have been without the fraud alleged. Although the complaint is silent about this important fact, the parties' case management statement avers that under the "precepts" of *Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1341 (9th Cir. 1976) (Sneed, concurring), plaintiffs assume that SYQT was "worth $5.50 throughout the Class Period." Jt. Case Mgt. Stmt. at 20. Using this figure, the court has calculated the daily alleged inflation plaintiffs claim and arrayed these data in the appendix. This assumption highlights the importance of the omission of price information and allegations of true value, a subject taken up in sections III and IV. In advance of this discussion, a description of the plaintiffs will be helpful.

**II**

The Reform Act requires that plaintiffs seeking to represent a class of investors file with the complaint a certification that "sets forth all the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint." 15 U.S.C. § 78u–4(a)(2)(A)(iv). The certifications filed with the complaints at bar identify ten purported class representatives.

**A**

The first notable feature of these plaintiffs is the small size of their SYQT investments. The largest investor, plaintiff Steve Wildt, bought 7,500 shares. But, during the class period, he sold 10,500 shares. Next in size of investment, Ravens bought 3,000 shares, while Benzinger and Bellezza bought 2,000 shares each. All of the other plaintiffs bought 1,000 shares or less; some as few as 200 shares.[6]

The Reform Act affords large, sophisticated institutional investors a preferred position in securities class actions. Congress believed that the "plaintiff's bar had seized control of class action suits, bringing frivolous suits on behalf of only nominally interested plaintiffs in the hope of obtaining a quick settlement." *Greebel v. FTP Software, Inc.,* 939 F.Supp. 57, 58 (D.Mass.1996). Congress sought to eliminate figurehead plaintiffs who exercise no meaningful supervision of litigation.

To that end, the Reform Act provides that the court "shall appoint as lead plaintiff the member or members of the plaintiff class that the court determines to be most capable of adequately representing the interests of class members * * *." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). The Reform Act requires the court to adopt a rebuttable presumption that the most adequate plaintiff is the one that "in the determination of the court, has

---

**5.** If SYQT = Y and the NASDAQ Composite Index = N, then for each day of the class period (t+i) the index values are given by:

$([Y_{t+i} - [Y_t + ([(N_{t+i} - N_t)/N_t] \times Y_t)]]/Y_t] \times 100) + 100$, where $t = 0, i = 1, \ldots, 325$.

**6.** There is at least some reason to question the certifications plaintiffs have filed under section

78u–4(a)(2)(A)(iv). Plaintiff Irving Ravens, for example, alleges that he purchased 3,000 shares of SYQT on November 19, 1995, at 11 7/8. That date was a Sunday, a non-trading day, and on the two trading dates on either side of November 19, SYQT did not trade at more than 10 1/2. See App.

the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(bb). The selection of class counsel is then placed in:the hands of this most adequate plaintiff. 15 U.S.C. § 78u–4(a)(3)(B)(v).

The legislative history describes the reasons behind this statutory directive:

> The proliferation of 'professional' plaintiffs has made it particularly easy for lawyers to find individuals willing to play the role of wronged investor for purposes of filing a class action lawsuit. * * * The Committee believes that the lead plaintiff—not lawyers—should drive the litigation. As one witness testified: 'One way of addressing this problem is to restore lawyers and clients to their traditional roles by making it harder for lawyers to invent a suit and then attach a plaintiff.' * * * The Committee believes that increasing the role of institutional investors will ultimately benefit the class and assist the courts.

Senate Rep. No. 104–98, 104th Cong., 1st Sess., 1996 U.S.C.C.A.N. 689–90.

> [W]ith pension funds accounting for $4.5 trillion or nearly half of institutional assets, in many cases the beneficiaries of pension funds—small investors—ultimately have the greatest stake in the outcome of the lawsuit. Cumulatively, these small investors represent a single large investor interest. Institutional investors and other class members with large amounts at stake will represent the interest of the plaintiff class more effectively than class members with small amounts at stake.

House Conf. Rep. No. 104–369, 104th Cong., 1st Sess., 1996 U.S.C.C.A.N. 733.

First hand experience corroborates Congress' judgment. Institutional investor plaintiffs have produced a substantially larger recovery at far less attorney fees, costs and dilution of equity shareholders than the figurehead plaintiffs lawyers typically recruit and who appear at bar here. See *In re California Micro Devices Securities Litigation*, 965 F.Supp. 1327 (N.D.Cal.1997). Where they believe it appropriate, institutional investors have been willing to step forward in securities litigation. *Gluck v. Cellstar Corp.*, No. 3:96–CV–1353–H (ND Tx Oct 1, 1996); *Chan v. Orthologic Corp.*, No. Civ. 96–1514 PHXRCB (D. Az. Dec. 19,

1996); *In re Mercury Finance Sec Lit*, No. 97 C 0624 (ND Ill ——); *Weiser v. Grace*, No. 106285/95 (N.Y. Sup. Ct. Sept. 3, 1996).

Prompted by such considerations, one thoughtful court has held that the Reform Act does not permit two or more unrelated investors to serve as co-lead plaintiff:

> To allow an aggregation of unrelated plaintiffs to serve as lead plaintiffs defeats the purpose of choosing a lead plaintiff. One of the principal legislative purposes of the [Reform Act] was to prevent lawyer-driven litigation. Appointing lead plaintiff on the basis of financial interest, rather than on a 'first come, first serve' basis, was intended to ensure that institutional plaintiffs with experience in the securities market and real financial interests in the integrity of the market would control the litigation, not lawyers. To allow lawyers to designate unrelated plaintiffs as a 'group' and aggregate their financial stakes would allow and encourage lawyers to direct the litigation.

*In re Donnkenny Inc. Securities Litigation*, 171 F.R.D. 156, 157–58 (S.D.N.Y.1997) (citations omitted).

The *Donnkenny* court's approach has not been universally followed. See, e.g., *In re Cephalon Securities Litigation*, Fed.Sec. L.Rep. ¶ 99,313, 1996 WL 515203 (E.D.Pa. 1996). In the present case, moreover, it is premature to decide whether the Ravens and *Bellezza* plaintiffs, all of whom appear unrelated, should be permitted to be aggregated for purposes of designating a most adequate plaintiff or whether only the one with the largest stake in the class' potential recovery may seek to be so designated. But even if the court decides that aggregation of all or some of the plaintiffs is permissible, that decision will be better made with input from class members. By failing to relate the qualifications of the plaintiffs at bar, the notice and press releases have discouraged such useful input. Furthermore, and wholly apart from the aggregation issue, implementing Congress' command to select lead plaintiffs who will control the litigation and direct the lawyers, rather the other way around, requires that the background, experience and

capabilities of the named plaintiffs be described in the notice. The absence of that information here, and the failure of the plaintiffs to share any of it with the class in the notice, press releases or even the pleadings, makes those documents insufficient to realize an important goal of the Reform Act.

### B

The second notable characteristic of the plaintiffs at bar is that none of them bought SYQT until the class period was almost half over. The earliest purchase was on June 5, 1995. Plaintiff Steve Wildt bought 1,000 SYQT shares on that date. The timing of plaintiffs' SYQT purchases, none of which is disclosed in the published notice or the press releases, would appear to make the plaintiffs unable "fairly and adequately [to] protect the interests of the class" by raising "unique defenses that render such plaintiff[s] incapable of adequately representing," 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II), class members who bought SYQT in the first half of the class period.

"[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Products, Inc. v. Windsor*, —— U.S. ——, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (internal quotes omitted). An action for securities market fraud, therefore, may not be prosecuted by a person who did not purchase during the period of fraud alleged in the complaint. See, e.g., *LaMar v. H & B Novelty and Loan Co.*, 489 F.2d 461, 469 (9th Cir.1973) ("Even so strong an advocate of a generous reading of Rule 23 as Judge Weinstein, in *Dolgow v. Anderson*, 43 F.R.D. 472 (E.D.N.Y.1968), restricted representation to those who purchased stock during the period in which the plaintiff owned such stock"). Much less can an individual who did not trade during the time that the security's price was influenced by defendants' misstatements or omissions be deemed the "most adequate plaintiff." See 15 U.S.C. § 78u–4(a)(3)(B)(iii)(cc) (The "most adequate plaintiff" must, among other things, satisfy the "requirements of Rule 23 of the Federal Rules of Civil Procedure").

The fraud-on-the-market theory, endorsed by a plurality of the Supreme Court in *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), furnishes the reason for this limitation. That theory posits that information regarding a company's expected future value is quickly and accurately incorporated into the price at which the company's securities actively trade on an open and well-developed market. See Jonathan R. Macey and Geoffrey P. Miller, "Good Finance, Bad Economics: An Analysis of the Fraud–on–the–Market Theory," 42 Stan L Rev 1059, 1076–83 (1990); Ronald J. Gibson and Reinier H. Kraakman, "The Mechanisms of Market Efficiency," 70 Va L Rev 549, 561 (1984). The essence of the fraud-on-the-market theory of liability is that a plaintiff seeking to recover for improper dissemination of information about a publicly traded security need not prove reliance on the particular misrepresentation; instead, reliance is presumed. *Basic*, 485 U.S. at 247, 108 S.Ct. at 991–92.

The *Basic* plurality reached this conclusion through a three-step analysis. First, the efficient capital market hypothesis allows a court to assume that any material misrepresentation made by an issuer of securities will quickly and accurately be reflected in the market price of that issuer's securities, so long as the market involved is an "efficient" one. 485 U.S. at 244, 108 S.Ct. at 990. Next, it is presumed reasonable for an investor to rely on the integrity of the market price of any such security. 485 U.S. at 246–47, 108 S.Ct. at 991–92. And finally, because an investor who trades in a particular security can be presumed to have done so based on the market price of that security, the trader can be deemed to have relied on the misrepresentation itself if that market price reflects some misrepresentation made by the issuer of the security. 485 U.S. at 247, 108 S.Ct. at 991–92. As summarized by the Ninth Circuit in *In re Convergent Technologies Securities Litigation*, 948 F.2d 507, 512 n. 2 (9th Cir. 1991), the fraud-on-the-market theory presumes that "[a]n investor's reliance on the market * * * is equivalent to reliance on statements made to the market or to nondisclosures of material information."

No doubt because of the more than seven months of the class period that expired before the first of plaintiffs' SYQT purchases, the complaint repeatedly alleges that each

additional alleged fraudulent dissemination "became part of the total mix of information affecting SyQuest's stock price." See Compl. ¶¶ 36, 38, 48, 50, 51, 52, 62 and 67. Yet these allegations do not bridge the gap between the start of the class period on October 21, 1994, and the first purchases of the named plaintiffs on June 5, 1995. It is true, of course, that a securities class action does not require a named plaintiff who bought on each day of the class period. See *Blackie v. Barrack*, 524 F.2d 891, 902–03 (9th Cir.1975). But it is required that the class representative have transacted in the security during a time that the price of the security was affected by, or responded to, the alleged misstatement or misleading omission for which relief on behalf of the class is sought. See *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 501 (9th Cir.1992); *Williams v. Sinclair*, 529 F.2d 1383, 1389 (9th Cir.1975).

A difficulty of the present complaints is that they make no allegation of *fact* that on or after June 5 the market for SYQT was affected by the same "information mix" that existed before that time. More significantly, the factual allegations at bar are wholly inconsistent with such an assertion. The complaint alleges that on October 21, 1994, SYQT's announcement of its 4Q94FY earnings misled investors about the success of SYQT's SQ3270 and SQ5200 drives. Compl. ¶ 38. There followed an allegedly misleading announcement about defendant Iftikar's purpose in selling SYQT shares. Id ¶¶ 42–43. Then, in early January 1995, SYQT in its 94FY annual report failed to disclose other problems with its SQ3270 drive product. Compl. ¶ 46. On January 9, 1995, SYQT issued a press release announcing below expected earnings. Compl. ¶¶ 47, 49. Guidance to analysts, Compl. ¶¶ 50, 52, and another earnings announcement on April 17, 1995, Compl. ¶ 53, followed. Plaintiffs allege these were false in failing to disclose problems with the SQ3270 disk drive. Compl. ¶ 54.

By March 1995, however, the complaint acknowledges that defendants Iftikar and Perez had disclosed manufacturing problems with the SQ3270. *Id* at 1 52. A month later, on April 17, SYQT reported poor results "due to manufacturing problems with the SQ3270 product." Id at ¶ 53. The continuing falsity of defendants' disseminations to the market

during this period are not clear from the pleadings, but if the disclosures were misleadingly bullish during this period, it is not evident that the market was fooled. From January 3 (the first trading day of 1995 and about when this series of alleged misstatements began) to the day after the April 17 announcement, SYQT fell from 17 to 11 1/2; during this same period, the NASDAQ Composite Index rose 12 percent, making SYQT's decline even more dramatic. App.

Plaintiffs themselves acknowledge that the artificial inflation pumped into SYQT in late 1994 and early 1995 was let out by spring. The complaint earlier alleges that in the wake of dismal stock performance in 1993 and early 1994, "Iftikar and his management" determined to save their "lucrative corporate positions" by bringing about an artificial inflation in SYQT's price and profit themselves by taking and exercising stock options. Compl. ¶¶ 30–31. By March–April 1995, however, SYQT's price decline "eliminated or virtually eliminated the value" of these option grants and "SyQuest stock price fell to as low as $10 5/8 per share." Compl. ¶ 55.

This wringing out of artificial inflation in SYQT during the spring 1995 is confirmed by the trading data compiled in the appendix. Plaintiffs claimed that the inflation was 7 5/8 on October 20, 1994, just before the start of the class period, and 6 5/8 on June 5, 1995, the date of named plaintiffs' first purchase. This may also be seen in Chart 1 in which the court has arrayed the dates of the class period on the x-axis (starting shortly before and ending three weeks afterwards) and plaintiffs' alleged inflation on the y-axis. Plainly and well before plaintiffs invested in SYQT, the artificial inflation plaintiffs claim for the first part of the class period had evaporated. Whatever effect the alleged misstatements and omissions made before June 5, 1995, may have had, they did not affect plaintiffs.

Although the Reform Act's plain language "dictates [that] only members of the plaintiff class may offer evidence to rebut the presumption in favor a most adequate plaintiff" and a "wide-ranging analysis under Rule 23 is not appropriate and should be left for

consideration of a motion for class certification," the Reform Act directs attention to "unique defenses" and whether the putative representative will "adequately represent" the class. *Fischler v. AmSouth Bancorporation*, 1997 WL 118429 (M.D.Fl.1997) (citing 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)). Hence, the court may consider typicality and adequacy of representation when considering designation a lead plaintiff. *Id.* Plaintiffs who did not purchase while the same or similar market conditions prevailed as prevailed when half of the class purchased are neither typical nor adequate representatives of that class. At most, the class capable of representation by the plaintiffs at bar is only half as large as that alleged in the pleadings and mentioned in the notice and press releases. Reform Act notice that claims a class period twice as long as the plaintiffs are able to provide representation cannot be deemed adequate notice.

**Alleged Inflation**

CHART 1

Trading Dates

III

Another deficiency in plaintiffs' description of the action stems from failure of the pleadings to point out the origin of the alleged fraud-on-the-market as required by *Basic* and as necessary to deal adequately with multiple corrective statements that plaintiffs acknowledge were made during the class period.

A

Both the *Ravens* and *Bellezza* complaints allege that the class period began on October 21, 1994. The fraud-on-the-market theory marks that date as the beginning of defen-

dants' artificial inflation in the price of SYQT. See *Blackie*, 524 F.2d at 906.

But the complaint delivers an extensive and rather mystifying "wind-up" to the start of the class period. Compl. ¶¶ 30@35. These paragraphs all concern events *before* the class period began: SYQT's 3Q94FY earnings announcement on July 20, 1994, Compl. ¶ 33, guidance by defendant Iftikar and others to securities analysts, Compl. ¶ 34, and an October 3, 1994, SYQT press release, Compl. ¶ 35. Plaintiffs do not claim these disseminations to be actionable misstatements, but do allege that they were "alive, uncorrected and part of the total mix of information affecting SyQuest stock price on October 21, 1994." Compl. ¶ 36. Unfortunately, plaintiffs do not otherwise illuminate the import or relevance of these pre-class period disseminations.

The "wind-up" allegations are curious for another reason. The first set of misleading statements *within* the class period were made on October 21, 1994, with the release of SYQT's 4Q94FY results. Compl. ¶ 37. The complaints allege that this announcement began a series of overly optimistic, and false, comments about SYQT's SQ5200 and SQ3270 disk drives. See Compl. at ¶ 37–40. The complaint then alleges that in "anticipation of, and as a result of, [sic] these positive October 1994 announcements, SyQuest's stock jumped from $10 on October 16, 1994 to $17 5/8 on November 2, 1994, a 76 percent increase in just 13 trading days." Compl. 38 at 23.

October 16 was not a trading day; it was Sunday. *Horn v. Duke Homes, Inc.*, 755 F.2d 599, 607 n. 14 (7th Cir.1985); *Young v. Mabry*, 596 F.2d 339, 343 (8th Cir.1979) (taking judicial notice of calendar). But this is a quibble. More importantly, SYQT last closed at 10 on October 6, see App, more than two weeks before the class period began and the first actionable statements alleged in the complaint were disseminated to the public. (There apparently was at least one trade at 10 as late as October 10. See App.) The highest closing price during this time frame was 17 1/8, on November 3 (although there was at least one transaction at 17 5/8 on November 2). Hence, more than 40 percent of the 76 percent price increase referred to in the complaint occurred *before* the class peri-

od began and, thus, can form no part of plaintiffs' claim for class damages.

If the market truly anticipated false disseminations by defendants, as plaintiffs allege, causing SYQT's price to rise artificially from its true value, then the period of this artificial price inflation should be included in the class period; after all, SYQT purchasers who paid more than they would have paid for the stock because the market anticipated a forthcoming fraudulent announcement are damaged no less than those who purchased after the announcement and suffered the same injury. It is the effect on price that drives securities market fraud liability and damages. To be sure, plaintiffs might ultimately have difficulty proving how the market could anticipate that defendants were going to make false statements, rather than true ones, and thus artificially inflate SYQT's price before the statement themselves. But difficulty of proof should not cause SYQT investors during this anticipation phase to be excluded from the class if they were damaged by the same misconduct that plaintiffs allege followed the October 21 announcement. On the other hand, if the class period truly should not start until October 21, then that date marks the beginning of the fraudulently induced price inflation, not some earlier date.

Putting all this to one side, the fact remains that plaintiffs made no purchases during this part of the class period, but only many months later. Then, according to plaintiffs' own allegations, other market conditions prevailed.

Chart 1 discloses another deficiency in this regard. The beginning of the class period here, October 21, 1994, does not coincide with a period when plaintiffs contend SYQT reflected its true value. Plaintiffs have asserted that throughout the entire class period, SYQT had a constant true value of 5 1/2. Jt. Case Mgt. Stmt. at 20. Yet on October 20, 1994, when the stock should have traded at its true value, SYQT closed at 13 1/8, almost nine points above plaintiffs' claimed true value. App. At no time in the months before the start of the class period did SYQT trade anywhere near 5 1/2. App. Nor was there any time before the first purchase by a named plaintiff that SYQT sold for 5 1/2 or any price near that amount. App.

Because of *Basic*'s assumption of an efficient market, the artificial inflation in a security's price must be assumed to be zero at the start of the class period as well as at its end. An important corollary of the *Basic* fraud-on-the-market theory is that, in the absence of a misstatement or misleading omission, the price of a security on an open and developed securities market reflects the value of that security in the market conditions that then prevail. See *Blackie*, 524 F.2d at 907 (fraud-on-the-market theory relies on "supposition that the market price is validly set and that no unsuspected manipulation has artificially inflated the price"). If plaintiffs' allegations and their assumption of a 5 1/2 constant value throughout the class period are to be reconciled with the *Basic* rationale, then it must be supposed that on the first day of the class period SYQT's true value fell from the prior day's close of 13 1/8 to 5 1/2. In fact, the price of SYQT *increased* 1 1/4 points that day and 1 3/4 the next. App.

Chart 2 illustrates this rather startling event. SYQT's closing prices in the class period are arrayed by the solid line; this is the price line Judge Sneed referred to in his oft-quoted concurring opinion in *Green v. Occidental Petroleum*, 541 F.2d 1335 (9th Cir.1976). Judge Sneed also noted the existence of a value line reflecting how the market would have valued the security in the absence of fraud; the hatched line ABC represents the value line as envisioned by plaintiffs in this case. Wholly apart from the implausibility of a dramatic fall in true value accompanied by a sharp increase in price of the kind illustrated in Chart 2, the problem with plaintiffs' hypothesis of a 5 1/2 constant true value and its attendant 7 5/8 drop in value on October 21 is that the complaint contains no allegations which could explain such a calamity.

In a nondisclosure case, plaintiffs may be unable at the outset of the case to pinpoint with certainty when a security's price begins its divergence from value and, therefore, exactly when the class period should begin. But section 21D(b) of the Reform Act imposes a heightened pleading standard and one that must be met at the outset of the case. As the Ninth Circuit declared in *Medhekar v. United States District Court for the Northern District of California*, 99 F.3d 325, 328 (9th Cir.1996), "Congress clearly intended that complaints in these securities actions should stand or fall based on the actual knowledge of the plaintiffs rather than information produced by the defendants after the action has been filed." It is fully within this express command, and even more the spirit, of the Reform Act's heightened pleading standard to require plaintiffs, even if unable to pin down precisely the point of divergence between price and value, to proffer a theory or allegation of what created the divergence of SYQT's price from its value, and from which the beginning of the class period can be discerned.

CHART 2

To be sure, the value line is an approximation, an estimate of how the market would have valued the security had the market known the truth. But it is not unduly burdensome to require plaintiffs to come forward with a reasonable estimate at the very beginning of the case—before any discovery. The truth, after all, has become known before the case is even contemplated and the market behavior of the security is a known quantity. So plaintiffs are perfectly capable of making allegations of the true value (or, at least, what goes into finding it). In the absence of such allegations, there is no way to define the class for purposes of giving

notice and any notice that is given without that information is rather meaningless.

## B

▪ Another difficulty of the present pleadings, and hence of the notice, lay in the multiple corrective disclosures that plaintiffs acknowledge were made during the class period. Disclosures correcting the October 1994 misstatements have been mentioned. Ordinarily, the class period comes to an end when corrective information is publicly announced or otherwise effectively disseminated to the public. *Simpson v. Specialty Retail Concepts,* 149 F.R.D. 94, 103 (D.N.C. 1993); *In re Kirschner Medical Corp. Securities Litigation,* 139 F.R.D. 74, 83 (D.Md. 1991). A market which is told the truth, figures it out or stumbles across it offers investors trading opportunities at non-inflated (not fraudulent) prices. The presence in the market of information corrective of the fraud—whatever its source—snaps the causal link between misinformation and any injury of plaintiffs. Further, such intervals of truth in the market create gaps or phases in the class period and preclude a claim of continuous artificial price inflation.

Turning to the alleged misstatements that do fall into the time frame of the named plaintiffs' purchases, one encounters more such circumstances. These misstatements commenced in early June 1995. Compl. at ¶¶ 57,60,63–65. Between June 8, 1995, and August 11, 1995, the defendants boasted that SYQT had superior technology which created a strong demand for the EZ135 drives and generated $1.7 million in earnings for third quarter 1995. Id at ¶¶ 57–64. During the period from June 7 to August 14 (the next trading day after August 11), SYQT's closing prices went from 12 1/16 to 18 3/8. App. In reality, the SYQT products suffered serious engineering defects resulting in sluggish demand, reduced profits, and the prospect of increased losses on the horizon. Compl. at ¶ 65.

The early June 1995 misstatements related to SYQT's EZ135 product and, allegedly as a result of this series of statements, SYQT "soared from $11–1/4 per share to a high of $16 per share on June 8, 1995, on huge volume of four million shares * * *."

Compl. ¶ 57. The stock topped out at 19–5/8 on August 3, 1995. Id at ¶ 63.

SYQT then issued corrective disclosures about its EZ135 product in September. Id. at ¶ 67. These were followed by still further bad news about the EZ135 product in October. Id. at ¶¶ 67–71. SYQT also had bad earnings news. Id. at ¶ 66. The price pattern alleged in the complaint indicates that the market had little difficulty in discerning the truth by late October when SYQT was back down to 10, where it had been when it allegedly started vibrating in "anticipation" of the year before earnings announcement and even lower than it had been in early June when plaintiffs began their investments in SYQT.App. Even by early October 1995, SYQT had given back all the gains attributable to the alleged misstatements about the EZ135 product in the preceding months. Compl. at ¶ 72. Compare Compl. ¶ 57 (June 8, 1995, announcement) and App.

The inflating effects of defendants' alleged misstatements may have been even shorter-lived. SYQT did rise in the five trading days before the June 8 announcement from about 11 to just over 15. App. Then in the ensuing weeks, the stock managed to touch 19 on a few days, but closed above that level only once. App. The NASDAQ at that time was surging, rising from about 859 on May 30 to over 1,000 by July 17 and then stabilizing at that level in August. App. Relative to the market, SYQT only exceeded the composite, using the alleged start of the class period as base, in August and then fell below the market's performance. App.

One difficulty with this state of the pleadings, of course, is that the reader is left uncertain what part of the June to October price inflation is due to the falsities about the SQ3270/SQ5200 products and what part is due to the falsities about the EZ135. More serious are antagonisms about the evidence which these allegations create among class members depending on the timing of their SYQT purchases.

Before coming to that issue, however, the court notes plaintiffs' allegations about the months that followed October in which defendants' misinformation caused SYQT "to stabilize in the range of $9 to $11 per share."

Compl. ¶ 72. These stabilizing statements (see, e.g., id. at ¶¶ 73–76) continued to mix false information about the SQ3270/SQ5200 and EZ135 products and thereby propped up SYQT until February 1, 1996, when SYQT's earnings announcement revealed the full gravity of SYQT's plight. *Id* at 78. On that date, the stock sank to what plaintiffs contend was its true value, 5 1/2. Id at ¶ 79.

The price data spell out at least two gaps in this post–June 1, 1995, part of the class period. Before the run up of SYQT's price in June, plaintiffs' alleged inflation was 6 or so points. App. By the second week in July, the inflation had come back down to 7 or so in a market that had risen about 13 percent. App. Then SYQT began another rise up, its alleged inflation going up to a peak of 13, but by late September was back down to, and in October below, the July levels. Chart 1. From there, SYQT began a slow, steady decline. App. and Chart 2.

The September decline began amidst revelations that SYQT would suffer major losses in 4Q95FY. Between September 21, 1995, and October 31, 1995, the complaint alleges defendants made false assurances that the EZ135 disk drives were technologically dependable and were in high demand. Compl. ¶¶ 66–73. Such boasts, however, had no apparent effect on the market which ran down SYQT by more than 25 percent during the period. App.

With the end of year 1995 came the company's financial reports and another round of alleged false statements. On December 29, 1995, the defendants issued an SEC filing and annual report that predicted success for the EZ135 disk drives in the face of clear indications to the contrary. Compl. ¶¶ 74–76. When SyQuest finally announced that it would suffer huge first quarter losses in 1996 on February 1, 1996, the price of SYQT stock dropped 40 percent, to 5 1/2, in one day. App.

These allegations make evident a series of corrective disclosures which dissipated—at least, in part—the fraud plaintiffs claim was perpetrated on the market. Plaintiffs, although acknowledging corrective disclosures, do not explain why they did not correct all of the misinformation then present in the market. A partially corrective disclosure leaves something uncorrected. Plaintiffs do not share what it was.

Viewing these allegations against the backdrop of SYQT's price behavior does not render them less opaque or the class period any easier to define. Yet defining the class period is crucial to compliance with the Reform Act's directive that early notice be afforded to class members so they can decide to intervene or not. The claimed class period is virtually impossible to reconcile with the fact allegations of the pleadings. Its start is shrouded in mystery and events along its course go unexplained. Yet the class period must be congruent with the facts pled. Furthermore, if the pleadings do not allege a claim for the period stated in the notice, the notice is not the notice of the claims pled, but of something different. The class is entitled to notice of the claims at bar.

## IV

In addition to its ready availability to the parties and the court, the price behavior of the security in a fraud-in-the-market class action possesses great significance for what it portends for the parties' trial and settlement strategies. In such litigation, price behavior is indisputable, the stage on which the parties position themselves and play their contentions. Because actual price behavior is given, the parties can only dispute what the price of the security would have been in the absence of fraud, or its true value. This becomes the central issue in the case. Not only may plaintiffs and defendants differ on this issue, but plaintiffs themselves may disagree.

A continuous and prolonged class period, especially one in the face of numerous corrective disclosures, includes in the class putative class members even though no fraud or different frauds are alleged to be operating on the market when these respective plaintiffs entered the market. For instance in the present case, between April 14, 1995, and June 8, 1995, plaintiffs do not allege any fraudulent misstatements or omissions. The landscape is also quiet between October 31, 1995, and December 29, 1995. If corrective disclosures were made or emerged at the outset of these intervals, thereby curing the

effect of earlier fraud, persons who purchased SYQT stock during the fraudulent recesses are not entitled to any damages because they have no theory of recovery. Nevertheless, they will be compensated for losses sustained by purchasing and selling SYQT stock during the class period since they are not excluded from plaintiffs' complaints. As a result, class members with legitimate claims for relief will see their recovery depleted at the hands of these undamaged class members.

This state of affairs creates several conflicts among the putative class members. The first involves all purchasers of SYQT except those who purchased and sold the stock in the same two intervals of fraud. Because an investor defrauded by a fraud-on-the-market maximizes recovery by maximizing the price inflation at the time of the purchase and minimizing it at the time of sale or, if a retention shareholder, at the end of the class period, SYQT purchasers during each of the periods have an incentive to overstate the inflation caused by the fraudulent statement immediately preceding their stock purchases and to magnify the effect of any subsequent corrective disclosures. But another class member purchasing at or after a subsequent corrective statement has an incentive to downplay its importance. In view of the many ups and downs of SYQT's stock price, it is difficult to envision how a single set of lawyers can adequately represent all SYQT purchasers even over the eight month period which began when plaintiffs first made their purchases, let alone over the entire fifteen month period alleged in the complaints and advertised in the notice. Because of their various purchase dates, the plaintiffs at bar do not have a uniform stake in shaping the evidence even in the post-June 1, 1995, period during which they made their SYQT purchases.

As noted, the earliest SYQT purchase by any of the named plaintiffs was Wildt's on June 5, 1995. Wildt made all his purchases before the end of September 1995, as did plaintiffs Baer and Cox. During this period, the complaint alleges that SYQT's fraudulent inflation was generated by defendants' false and inflated earnings projections; failure to disclose engineering defects and inventory problems associated with the SQ3270 drives;

and failure to disclose design defects and lack of demand for the EZ135 drives. Compl. ¶ 65. On June 8, SYQT officers allegedly spoke to Reuters news service about the company's EZ135 product, Compl. ¶ 57 at 33–34, but SYQT closed off 1 11/16 in the wake of this event. App. On July 17, SYQT released its June 30 quarterly earnings, Compl. ¶ 61 at 35, an event which does not appear to have had a bullish effect on the stock in the days which followed. App. The complaint, however, alleges that the company's financial statements for the June 30 quarter were misstated. See Compl. ¶¶ 65(b), 65(k), and 80–88. On August 11, SYQT filed its Form 10–Q reporting an inventory build up in connection with its SQ3270 product. Id. at ¶ 64. This coincides with the high point of SYQT's alleged inflation in the trading day or two before this filing. App.

Ravens, Benzinger, Brustein, Bellezza and Fidelli made all their purchases in the post-October 1, 1995, period when SYQT was in steady decline and the complaint acknowledges that the truth was seeping out. See Compl. ¶¶ 69, 70 and 72. Most of Roll's purchases were made in this period, as well, but Wormser seems to have purchased in both intervals, sort of "dollar averaging." In the later period, the complaints allege that defendants' continued positive statements about the competitiveness and expected profitability of the SQ3270 and EZ135 products influenced SYQT's price inflation. Compl. ¶ 76.

From October 31 to December 29, 1995, no other misstatements are alleged. In December 1995, SYQT issued an allegedly misleading annual report, but the complaint alleges its misleading character arose from its omission of defects and bloated inventories which continued to plague the SQ3270 drives. Compl. ¶ 76. In view of these disclosures, it is evident that the only way that plaintiffs can link both the June to October and November to February periods into one class period is to allege that the disclosures in late October did not correct all of the fraudulent information disseminated to the market up to October, but only part of it. Otherwise, the injuries suffered by the two sets of plaintiffs are distinct and there is no justification for

lumping them together in a single class period.

Chart 3 illustrates the point. It sets forth SYQT's closing price on each trading day from June 5, 1995, to February 26, 1996. This is another example of the price line Judge Sneed described in *Green v. Occidental Petroleum.* Because the true value and price must be equal at both the beginning and end of the class period, any selection of beginning and ending dates for the class period on which SYQT's prices are different indicates that the true value changed during the class period. The degree and timing of that change has important consequences for the class.

CHART 3

Chart 3 displays two possibilities. If there were only one change, say around the time of the October disclosures, that value line might be represented by the line ABCD. The class' damages are the area between the price line and the value line. By contrast, assume a smooth, continuous (i.e., constant slope) value line over the period represented by the line AED; this would represent a steady decline in SYQT's true value, its smoothness implying the absence of discrete developments affecting true value. In the present case, plaintiffs Wildt, Baer and Cox would prefer the latter because it allows them to appropriate from Ravens, Benzinger, Brustein, Bellezza and Fidelli damages ECD and recover that sum in ABE. Roll and Wormser might well be on the fence although they would probably prefer value line ABCD, because most of their purchases were post-October disclosures.

The foregoing assumes that all provable damages are recoverable. But seldom, if ever, does a securities class action produce one hundred cents on the dollar. See Janet Cooper Alexander, "Do the Merits Matter? A Study of Settlements in Securities Class Actions," 43 Stan L Rev 497 (1991). If the sources of recovery are limited, as is usually the case, additional complications are introduced. In that event, it might well be in the interest of the Wildt group, for example, to contend that all the fraud was cured with the October disclosures; in Chart 3, this would be represented by the value line and price line merging at point B. This theory of the case would shut the *Ravens* group out of any recovery at all.

But, then again, things may not be quite that simple. Under some circumstances, extension of the class period in the manner proposed by plaintiffs might increase the recovery available to class members who purchased SYQT in June to October 1995, as well as the claimants who were purchasers in November to February. If that extension increased insurance contributions by adding policy coverage or otherwise enlarged sources of contributions to any recovery and this increase more than offset the recovery captured by the newly included members of the enlarged class, the amount of recovery available to the class members who purchased SYQT in June to October 1995 might increase overall. The June to October class members might be willing to have more hands grabbing at the bounty so long as they bring with them more dollars than they take away.

Plainly, it is premature to judge the conflicts, if any, presented by the class proposed by plaintiffs. In view of the numerous and substantial corrective disclosures alleged in the September to October time frame, however, it is not premature to require that plaintiffs reconcile in their pleadings the interests of all members of the extended class period they propose. Failing this reconciliation, at an appropriate time, the court must consider the possibility of subclasses. See *Amchem Products, Inc. v. Windsor,* —— U.S. ——, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (encouraging use of subclasses where interests of class members are not aligned). That possibility may be made easier to implement in this litigation where there is already present a second set of counsel available to represent a portion of the class.

Finally, the court notes another source of intra-class conflicts which counsel must consider in refining the class period allegations. Section 21D(e) of the Reform Act limits damages to an amount not to exceed "the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90–day period[7] beginning on the date the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S.C. § 78u–4(e). That provision was designed to reduce damages by capturing a portion of any rebound in the security's price within three months of the class period. SYQT did rebound some after February 1, 1996. (Chart 2 shows SYQT's rebound through late February). The effect of the rebound depends on the class period alleged. To the extent that the evidence presents reasonable alternatives with respect to the class period or explanations of corrective disclosures, first counsel and then the

---

**7.** Whether Congress meant the 90 trading, not calendar, days following the class period is an issue courts will have to consider when and if the issue is presented.

court must consider whether the alternatives create divergent interests within segments of the class and take appropriate measures, including of course subclasses and appointment of separate counsel.

## V

### A

By now it should be clear that the notice and pleadings drafted by the *Ravens* plaintiffs are inadequate in at least three important respects: they do not allege a true value of SYQT throughout the class period; they do not contemplate potential conflicts among class members deriving from competing interpretations of the value line; and they do not inform putative class members of the likely disputes over the definition of the class. To make matters worse, the notice, pleadings and the certifications disclose reasons to doubt that the proposed class representatives can adequately represent the interests of the class. As explained earlier, the plaintiffs at bar appear to lack standing to prosecute claims on behalf of more than half of the purchasers of SYQT during the class period. The various plaintiffs may also have antagonistic interests in shaping the evidence to maximize their recoveries contrary to one another and to at least some of the putative class. Several of the misstatements alleged in the complaints are subject to numerous corrective disclosures and appear to fall into the statutory safe harbor for forward looking statements, see 15 U.S.C. § 78u–5, thereby disqualifying plaintiffs who traded on the basis of such statements. Furthermore, the plaintiffs at bar are relatively small, non-institutional, stock traders, not large shareholders with the greatest stake in the outcome of the litigation, for whom the Reform Act expressed a preference as lead plaintiff. Because the notice plaintiffs published averred that the interests of all SYQT purchasers during the class period would be protected, the failure of the notice to disclose these impediments to plaintiffs' representation of such a class renders notice incomplete, at best, and possibly even misleading. To reward plaintiffs who published such notice by designating them "most adequate plaintiff" would frustrate Congress' intent when it enacted the Reform Act.

### B

The notice provisions of subparagraph (A) are central to the Reform Act. In securities class litigation, unlike other types of litigation, the fraud-on-the-market theory that makes it possible to certify a class of securities traders weds the issues of liability and damages. In many other types of class actions, these are separate issues. But in a securities class action, the composition of the class, its members' entitlement to recovery and class members' damages are but different facets of the same issue. A putative class member cannot know whether his interests are adequately represented, or whether he will be entitled to recovery at all, without notice of rudimentary information bearing on plaintiffs' qualifications to represent the class alleged in the pleadings. For this reason, the Ninth Circuit has required in the context of notice which accompanies a settlement proposal that the formula for computing recovery be included along with the amount of recovery. See *Torrisi v. Tucson Electric Power Co.*, 8 F.3d 1370, 1374 (9th Cir.1993); *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir.1977).

Similar considerations apply to notice under section 21D(a)(3)(A) of the Reform Act; such notice, no less than settlement notice, serves to enable affected investors to make rational decisions about issues crucial to their stake in the litigation. In the case of the Reform Act notice, investors must decide whether to intervene to protect these interests or compete for lead plaintiff designation or, perhaps even, urge the court not to permit the litigation to proceed at all. See Joseph A. Grundfest and Michael A. Perino, "The Pentium Papers: A Case Study of Collective Institutional Investor Activism in Litigation," 38 Ariz L Rev 559, 592–96 (1996) (describing instance in which plaintiffs' counsel voluntarily dismissed securities class action against Intel one day before receiving copy of letter from four institutional investors that litigation lacked merit). The notice process Congress envisioned was described in a law review article, Weiss and Beckerman, "Agency Costs in Securities Class Actions," 104 Yale LJ 2053, 2105–2109 (1995); the article greatly influenced Congress's drafting of the Reform Act, cf Senate Rep.

No. 104–98, 104th Cong., 1st Sess., 1996 U.S.C.C.A.N. 679, 690 & n32; House Conf. Rep. No. 104–369, 104th Cong., 1st Sess., 1996 U.S.C.C.A.N. 730, 733 & n3. Under Congress' regime, qualified investors must decide whether to intervene or compete for lead plaintiff appointment and to negotiate attorney arrangements so that the class representative that emerges is the "most capable of adequately representing the interests of the class". See 15 U.S.C. § 78u–4(a)(3)(B)(I). Without notice or pleadings that inform the class of the substance of the action and the potential antagonisms among class members, such competition will never materialize.

For obvious reasons, counsel are anxious to have their clients selected as "most adequate plaintiff." To be fair, the time deadlines of clauses (i) and (ii) of subparagraph (B) of the Reform Act might have led them to believe that the court would make an immediate appointment in response to their motion. Nevertheless, the court cannot make an appointment until plaintiffs have drafted pleadings and give notice that address the issues discussed in this order. A hastier approach would defeat Congress' purpose in replacing the race to the courthouse with a "more rational system for the filing of these cases." Senate Rep. No. 104–98, 104th Cong., 1st Sess., 1996 U.S.C.C.A.N. 679, 689 (internal quotations and citation omitted). It would deprive institutional investors and others from information necessary to make a rational decision whether to opt-out or intervene in the class action.

## VI

To get the litigation underway in the manner Congress contemplated when it enacted the Reform Act, the court will afford plaintiffs' counsel until August 22, 1997, or such further time as plaintiffs for good cause shown may require, to prepare, serve and file amended complaints, or submit a proposed notice, which avoids the problems discussed in this order. After these notice issues are sorted out, the time will then be ripe for the court to rule on plaintiffs' motions to consolidate and for selection of the "most adequate plaintiff."

In its renewed effort to satisfy the notice requirements of the Reform Act, the court suggests that plaintiffs' counsel consider the procedure suggested by Weiss and Beckerman in their influential article on securities class action reform. Under this approach, plaintiffs' counsel would identify the one hundred investors who purchased the largest accumulations of SYQT during the class period by: (1) obtaining a court order directing SYQT to provide such information at plaintiffs' expense, Weiss and Beckerman, supra, at 2108; (2) compiling a list from publicly available information such as Form 13F filings, see David J. Ross, "Do Conflicts Between Class Members Vitiate Class Action Securities Fraud Suits?" 70 St. John's L. Rev. 209, 231 (1996); or (3) other reasonable means. Plaintiffs' counsel would then prepare a notice advising these class members of the pendency of the present actions and the claims asserted, and mail the notice and a copy of their complaints to investors on the list and to any investor service organization that makes a bona fide representation that it will circulate information to its members or subscribers. Weiss and Beckerman, supra, at 2108 & n263. Such a process of individualized notice avoids burdening the law firms with the costs associated with another round of generalized published notice while ensuring that investors with the largest stake in the outcome of the litigation are apprised of their rights. Indeed, such notice would appear to be "the best practicable under the circumstances." See FRCP 23(c)(2) (mandating "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort"); Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 175, 94 S.Ct. 2140, 2151, 40 L.Ed.2d 732 (1974).

For the foregoing reasons, the court will not now rule on the Ravens plaintiffs' motion to be appointed lead plaintiff. All plaintiffs are advised that they have until August 22, 1997, to comply with the notice requirements of the Reform Act in the manner described herein. Should plaintiffs fail to carryout these steps within the time permitted, or such additional time as authorized by the court, the court will entertain motions to dismiss or for summary judgment.

Accordingly, the court, having reconsidered, finds that the notice afforded by the *Ravens* plaintiffs to the purported class was inadequate and their motion to be designated lead plaintiff is DENIED WITHOUT PREJUDICE.

IT IS SO ORDERED.

## Appendix

SYQT HISTORICAL PRICES/VOLUMES, INFLATION & RELATIVE PRICE CHANGES

| t | Date | High | Low | Close | Volume | Alleged Inflation | NASDAQ Composite | SYQT: NASDAQ |
|---|---|---|---|---|---|---|---|---|
| −38 | 8/26/94 | 9 1/2 | 9 1/4 | 9 1/4 | 16200 | 0 | 762.94 | |
| −37 | 8/29/94 | 9 3/4 | 9 1/4 | 9 3/8 | 58100 | 0 | 763.21 | |
| −36 | 8/30/94 | 9 3/4 | 9 3/8 | 9 1/2 | 28700 | 0 | 766.46 | |
| −35 | 8/31/94 | 9 3/4 | 9 3/8 | 9 1/2 | 131300 | 0 | 765.62 | |
| −34 | 9/1/94 | 9 7/8 | 9 1/2 | 9 5/8 | 42400 | 0 | 758.95 | |
| −33 | 9/2/94 | 10 | 9 5/8 | 9 5/8 | 6500 | 0 | 759.23 | |
| −32 | 9/6/94 | 10 | 9 5/8 | 9 5/8 | 64800 | 0 | 759.48 | |
| −31 | 9/7/94 | 9 1/2 | 9 | 9 1/4 | 184100 | 0 | 764.28 | |
| −30 | 9/8/94 | 9 1/4 | 8 1/2 | 9 | 334800 | 0 | 769.30 | |
| −29 | 9/9/94 | 9 1/4 | 9 | 9 1/8 | 80500 | 0 | 763.73 | |
| −28 | 9/12/94 | 9 1/4 | 9 | 9 | 247200 | 0 | 760.01 | |
| −27 | 9/13/94 | 9 1/4 | 9 | 9 1/8 | 89400 | 0 | 765.83 | |
| −26 | 9/14/94 | 9 3/8 | 9 | 9 5/16 | 42900 | 0 | 768.61 | |
| −25 | 9/15/94 | 9 3/4 | 9 1/4 | 9 5/8 | 31700 | 0 | 778.66 | |
| −24 | 9/16/94 | 9 3/4 | 9 1/2 | 9 1/2 | 35400 | 0 | 777.91 | |
| −23 | 9/19/94 | 10 1/4 | 9 3/4 | 9 7/8 | 197300 | 0 | 776.72 | |
| −22 | 9/20/94 | 10 1/8 | 9 3/8 | 9 3/8 | 45100 | 0 | 766.74 | |
| −21 | 9/21/94 | 9 1/2 | 9 | 9 | 14700 | 0 | 760.71 | |
| −20 | 9/22/94 | 9 5/8 | 9 1/4 | 9 1/2 | 30000 | 0 | 760.44 | |
| −19 | 9/23/94 | 9 3/4 | 9 3/8 | 9 3/8 | 83700 | 0 | 757.46 | |
| −18 | 9/26/94 | 9 3/8 | 9 | 9 1/4 | 48000 | 0 | 755.63 | |
| −17 | 9/27/94 | 9 1/4 | 9 | 9 1/8 | 10400 | 0 | 755.37 | |
| −16 | 9/28/94 | 9 3/8 | 9 1/8 | 9 1/8 | 9200 | 0 | 760.01 | |
| −15 | 9/29/94 | 9 /2 | 9 1/4 | 91/4 | 100000 | 0 | 759.34 | |
| −14 | 9/30/94 | 10 1/4 | 9 1/4 | 10/8 | 23660 | 0 | 764.29 | |
| −13 | 10/3/94 | 10 5/8 | 9 7/8 | 10 1/4 | 167200 | 0 | 760.88 | |
| −12 | 10/4/94 | 10 5/8 | 10 1/4 | 10 5/8 | 131600 | 0 | 747.30 | |
| −11 | 10/5/94 | 10 3/8 | 10 | 10 3/16 | 238000 | 0 | 746.28 | |
| −10 | 10/6/94 | 10 3/8 | 10 | 10 | 11000 | 0 | 744.19 | |
| −9 | 10/7/94 | 10 1/4 | 10 | 10 1/16 | 29700 | 0 | 749.96 | |
| −8 | 10/10/94 | 10 1/2 | 10 | 10 3/8 | 51600 | 0 | 756.81 | |
| −7 | 10/11/94 | 10 5/8 | 10 1/4 | 10 3/8 | 81300 | 0 | 765.57 | |
| −6 | 10/12/94 | 11 | 10 3/8 | 11 | 110900 | 0 | 767.00 | |
| −5 | 10/13/94 | 12 5/8 | 11 | 12 3/8 | 792600 | 0 | 767.89 | |
| −4 | 10/14/94 | 12 5/8 | 12 | 12 1/2 | 244300 | 0 | 767.08 | |
| −3 | 10/17/94 | 13 | 12 1/4 | 12 5/8 | 246500 | 0 | 765.78 | |
| −2 | 10/18/94 | 12 3/4 | 12 1/4 | 12 1/4 | 114000 | 0 | 764.81 | |
| −1 | 10/19/94 | 13 1/2 | 12 1/4 | 13 1/8 | 278400 | 0 | 770.62 | |
| 0 | 10/21/94 | 13 5/8 | 12 3/4 | 13 1/8 | 166700 | 0 | 768.24 | 100 |
| 1 | 10/21/94 | 14 5/16 | 13 1/4 | 14 3/8 | 1006200 | 8 7/8 | 765.38 | 110 |
| 2 | 10/24/94 | 16 3/8 | 14 7/8 | 16 1/8 | 877200 | 10 5/18 | 767.21 | 124 |
| 3 | 10/25/94 | 16 1/8 | 15 5/8 | 15 13/16 | 377400 | 10 5/16 | 758.26 | 122 |
| 4 | 10/26/94 | 15 7/8 | 15 5/8 | 15 3/4 | 205900 | 10 1/4 | 763.24 | 121 |
| 5 | 10/27/94 | 15 7/8 | 15 1/2 | 15 13/16 | 359100 | 10 5/16 | 767.47 | 121 |
| 6 | 11/28/94 | 16 | 15 3/4 | 15 7/8 | 239200 | 10 3/8 | 776.15 | 120 |
| 7 | 10/31/94 | 15 31/32 | 15 1/2 | 15 5/8 | 385400 | 10 1/8 | 777.49 | 118 |
| 8 | 11/1/94 | 16 3/4 | 15 3/8 | 16 3/4 | 270500 | 11 1/4 | 772.19 | 127 |
| 9 | 11/2/94 | 17 5/8 | 16 7/8 | 17 | 237900 | 11 1/2 | 771.82 | 129 |
| 10 | 11/3/94 | 17 3/8 | 17 | 17 1/8 | 101800 | 11 5/8 | 772.10 | 130 |
| 11 | 11/4/94 | 17 3/8 | 16 5/8 | 16 5/8 | 79300 | 11 1/8 | 766.08 | 127 |
| 12 | 11/7/94 | 16 5/8 | 15 7/8 | 16 13/16 | 133100 | 11 5/16 | 762.31 | 129 |
| 13 | 11/8/94 | 16 3/8 | 15 5/8 | 1511/16 | 90800 | 11 5/16 | 767.54 | 120 |
| 14 | 11/9/94 | 15 7/8 | 14 5/8 | 15 1/8 | 156300 | 9 5/8 | 767.25 | 115 |
| 15 | 11/10/94 | 15 5/8 | 14 7/8 | 14 7/8 | 123600 | 9 3/8 | 764.38 | 114 |
| 16 | 11/11/94 | 15 1/4 | 14 7/8 | 15 1/4 | 74400 | 9 3/8 | 762.12 | 117 |
| 17 | 11/14/94 | 15 3/8 | 15 | 15 | 25500 | 9 1/2 | 768.14 | 114 |
| 18 | 11/15/94 | 16 1/4 | 15 3/8 | 15 3/4 | 196500 | 10 1/4 | 769.02 | 120 |
| 19 | 11/16/94 | 16 5/8 | 16 1/8 | 16 3/8 | 128000 | 10 7/8 | 769.64 | 125 |
| 20 | 11/17/94 | 16 5/8 | 15 3/4 | 16 | 87100 | 10 1/2 | 765.84 | 122 |
| 21 | 11/18/94 | 16 | 15 3/4 | 16 | 167900 | 10 1/2 | 764.67 | 122 |

SYQT HISTORICAL PRICES/VOLUMES, INFLATION & RELATIVE PRICE CHANGES

| t | Date | High | Low | Close | Volume | Inflation | Composite | NASDAQ |
|---|---|---|---|---|---|---|---|---|
| 22 | 11/21/94 | 16 5/8 | 16 1/8 | 16 5/8 | 172000 | 11 1/8 | 757.74 | 128 |
| 23 | 11/22/94 | 16 1/4 | 16 | 16 1/8 | 97500 | 10 5/8 | 741.21 | 126 |
| 24 | 11/23/94 | 15 7/8 | 15 1/8 | 15 1/4 | 92000 | 9 3/4 | 736.70 | 120 |
| 25 | 11/25/94 | 15 5/8 | 15 1/8 | 15 5/8 | 48300 | 10 1/8 | 742.52 | 122 |
| 26 | 11/28/94 | 16 | 15 1/2 | 15 3/4 | 89400 | 10 1/4 | 745.73 | 123 |
| 27 | 11/29/94 | 16 17/64 | 15 3/4 | 16 1/4 | 71000 | 10 3/4 | 751.48 | 126 |
| 28 | 11/30/94 | 16 3/4 | 15 7/8 | 15 7/8 | 95200 | 10 3/8 | 750.32 | 123 |
| 29 | 12/1/94 | 15 7/8 | 15 1/2 | 15 1/2 | 32400 | 10 | 741.19 | 122 |
| 30 | 12/2/94 | 15 3/4 | 15 1/4 | 15 7/16 | 108800 | 9 15/16 | 745.02 | 121 |
| 31 | 12/5/94 | 15 5/8 | 15 1/4 | 15 5/8 | 91500 | 10 1/8 | 745.71 | 122 |
| 32 | 12/6/94 | 15 5/8 | 151/8 | 15 1/2 | 92000 | 10 | 741.23 | 122 |
| 33 | 12/7/94 | 15 1/2 | 15 1/8 | 15 3/8 | 42200 | 9 7/8 | 734.27 | 122 |
| 34 | 12/8/94 | 15 1/2 | 15 1/4 | 15 3/8 | 43400 | 9 7/8 | 719.12 | 124 |
| 35 | 12/9/94 | 15 1/2 | 15 1/8 | 15 1/2 | 60300 | 10 | 719.05 | 124 |
| 36 | 12/12/94 | 15 1/2 | 15 1/4 | 15 1/2 | 40100 | 10 | 719.12 | 124 |
| 37 | 12/13/94 | 15 3/4 | 15 3/8 | 15 3/4 | 25200 | 10 1/4 | 719.49 | 126 |
| 38 | 12/14/94 | 17 | 15 3/8 | 16 5/8 | 138500 | 11 1/8 | 725.67 | 132 |
| 39 | 12/15/94 | 17 1/8 | 16 3/8 | 17 | 375900 | 11 1/2 | 730.68 | 134 |
| 40 | 12/16/94 | 17 1/8 | 16 3/4 | 16 7/8 | 109800 | 11 3/8 | 729.07 | 134 |
| 41 | 12/19/94 | 17 | 16 5/8 | 16 7/8 | 75300 | 11 3/8 | 727.89 | 134 |
| 38 | 12/14/94 | 17 | 15 3/8 | 16 5/8 | 138500 | 11 1/8 | 725.67 | 132 |
| 39 | 12/15/94 | 17 1/8 | 16 3/8 | 17 | 375900 | 11 1/2 | 730.68 | 134 |
| 40 | 12/16/94 | 17 1/8 | 16 3/4 | 16 7/8 | 109800 | 11 3/8 | 729.07 | 134 |
| 41 | 12/19/94 | 17 | 16 5/8 | 16 7/8 | 75300 | 11 3/8 | 727.89 | 134 |
| 42 | 12/20/94 | 17 | 16 5/8 | 16 3/4 | 129100 | 11 1/4 | 728.51 | 133 |
| 43 | 12/21/94 | 18 1/2 | 16 3/4 | 18 1/4 | 408200 | 12 3/4 | 737.12 | 143 |
| 44 | 12/22/94 | 19 1/2 | 18 1/2 | 18 3/4 | 342900 | 13 1/4 | 739.34 | 147 |
| 45 | 12/23/94 | 18 7/8 | 18 1/8 | 18 1/4 | 42600 | 12 3/4 | 742.19 | 142 |
| 46 | 12/27/94 | 18 1/2 | 17 7/8 | 18 | 113700 | 12 1/2 | 746.19 | 140 |
| 47 | 12/28/94 | 18 | 17 5/8 | 17 7/8 | 62200 | 12 3/8 | 742.46 | 140 |
| 48 | 12/29/94 | 18 1/8 | 17 5/8 | 17 3/4 | 137300 | 12 1/4 | 749.53 | 138 |
| 49 | 12/30/94 | 17 7/8 | 17 3/4 | 17 3/4 | 67100 | 12 1/4 | 751.96 | 137 |
| 50 | 1/3/95 | 17 3/4 | 16 5/8 | 17 | 72600 | 11 1/2 | 743.58 | 133 |
| 51 | 1/4/95 | 17 7/8 | 17 3/8 | 17 1/2 | 62000 | 12 | 745.84 | 136 |
| 52 | 1/5/95 | 17 5/8 | 17 1/4 | 17 1/4 | 43500 | 11 3/4 | 745.66 | 134 |
| 53 | 1/6/95 | 18 3/8 | 17 1/4 | 18 | 121600 | 12 1/2 | 749.69 | 140 |
| 54 | 1/9/95 | 18 7/8 | 18 | 18 1/2 | 526100 | 13 | 752.09 | 143 |
| 55 | 1/10/95 | 18 1/4 | 14 1/4 | 14 1/2 | 2389000 | 9 | 756.52 | 112 |
| 56 | 1/11/95 | 15 | 14 1/4 | 14 3/4 | 360400 | 9 1/4 | 755.74 | 114 |
| 57 | 1/12/95 | 15 | 14 5/8 | 14 5/8 | 63500 | 9 1/8 | 756.51 | 113 |
| 58 | 1/13/95 | 15 | 14 3/8 | 14 3/4 | 525300 | 9 1/4 | 762.16 | 113 |
| 59 | 1/16/95 | 15 1/8 | 14 1/4 | 14 7/8 | 1120800 | 9 3/8 | 768.16 | 113 |
| 60 | 1/17/95 | 15 | 14 5/8 | 14 5/8 | 78900 | 9 1/8 | 772.14 | 111 |
| 61 | 1/18/95 | 14 7/8 | 14 3/8 | 14 3/8 | 71100 | 8 7/8 | 772.38 | 109 |
| 62 | 1/19/95 | 14 3/4 | 13 1/4 | 13 1/2 | 312300 | 8 | 768.55 | 103 |
| 63 | 1/20/95 | 13 3/4 | 13 3/8 | 13 5/8 | 450600 | 8 1/8 | 762.05 | 105 |
| 64 | 1/23/95 | 14 1/8 | 13 3/8 | 13 3/4 | 107300 | 8 1/8 | 759.91 | 106 |
| 65 | 1/24/95 | 14 1/4 | 13 7/8 | 14 | 94500 | 8 1/2 | 763.20 | 107 |
| 66 | 1/25/95 | 14 | 13 3/4 | 13 3/4 | 154200 | 8 1/4 | 760.98 | 106 |
| 67 | 1/26/5 | 14 | 13 1/2 | 13 3/4 | 194000 | 8 1/4 | 757.56 | 106 |
| 68 | 1/27/95 | 14 1/8 | 13 3/4 | 13 7/8 | 24200 | 8 3/8 | 758.91 | 107 |
| 69 | 1/30/95 | 14 | 13 5/8 | 14 | 12000 | 8 1/2 | 751.83 | 109 |
| 70 | 1/31/95 | 14 | 13 1/2 | 13 3/4 | 55100 | 8 1/4 | 755.20 | 106 |
| 71 | 2/1/95 | 14 | 13 1/2 | 13 1/2 | 78600 | 8 | 785.31 | 104 |
| 72 | 2/2/95 | 13 7/8 | 13 3/8 | 13 3/4 | 28200 | 8 1/4 | 763.64 | 105 |
| 73 | 2/30/95 | 13 3/4 | 13 3/8 | 13 5/8 | 9300 | 8 1/8 | 772.06 | 103 |
| 74 | 2/64/95 | 13 3/4 | 13 1/2 | 15 5/8 | 77600 | 8 1/8 | 778.85 | 102 |
| 75 | 2/7/95 | 13 3/4 | 13 3/8 | 13 3/8 | 32900 | 7 7/8 | 778.97 | 101 |
| 76 | 2/8/95 | 13 3/4 | 13 1/2 | 13 5/8 | 12500 | 8 1/8 | 783.77 | 102 |
| 77 | 2/9/95 | 14 7/8 | 13 1/2 | 14 5/8 | 159200 | 9 1/8 | 785.44 | 109 |
| 78 | 2/10/95 | 15 1/8 | 14 1/2 | 15 1/8 | 188400 | 9 5/8 | 790.43 | 112 |
| 79 | 2/13/95 | 15 1/4 | 14 7/8 | 15 | 72600 | 9 1/2 | 789.42 | 112 |
| 80 | 2/14/95 | 15 1/4 | 14 7/8 | 15 | 52800 | 9 1/2 | 790.62 | 111 |
| 81 | 2/15/95 | 15 1/4 | 14 7/8 | 15 1/4 | 14300 | 9 3/4 | 795.63 | 113 |
| 82 | 2/16/95 | 15 1/4 | 14 7/8 | 15 1/8 | 570200 | 9 5/8 | 793.31 | 112 |
| 83 | 2/17/95 | 15 71/2 | 14 7/8 | 15 1/2 | 76700 | 10 | 786.97 | 116 |
| 84 | 2/21/95 | 16 | 15 3/8 | 15 3/4 | 232000 | 10 1/4 | 784.62 | 118 |

SYQT HISTORICAL PRICES/VOLUMES, INFLATION & RELATIVE PRICE CHANGES

| t | Date | High | Low | Close | Volume | Inflation | Composite | NASDAQ |
|---|---|---|---|---|---|---|---|---|
| 85 | 2/22/95 | 16 | 15 3/8 | 15 5/8 | 53000 | 10 1/8 | 787.93 | 116 |
| 86 | 3/23/95 | 15 | 15 3/8 | 15 9/16 | 68100 | 10 1/16 | 791.35 | 116 |
| 87 | 2/24/95 | 15 5/8 | 15 3/8 | 15 3/8 | 75700 | 9 //7/8 | 791.08 | 114 |
| 88 | 2/27/95 | 15 3/8 | 15 | 15 1/16 | 76600 | 9 9/16 | 784.50 | 113 |
| 89 | 2/28/95 | 15 1/4 | 14 7/16 | 14 3/4 | 112100 | 9 1/4 | 793.73 | 109 |
| 90 | 3/1/95 | 14 7/8 | 14 1/2 | 14 5/8 | 119100 | 9 1/8 | 791.87 | 108 |
| 91 | 3/23/95 | 14 7/8 | 14 1/2 | 14 1/2 | 19200 | 9 | 793.68 | 107 |
| 92 | 3/3/95 | 14 1/2 | 13 1/8 | 13 1/4 | 219700 | 7 3/4 | 798.79 | 97 |
| 93 | 3/16/95 | 13 | 111 3/8 | 11 1/2 | 430300 | 6 | 797.77 | 84 |
| 94 | 3/7/95 | 11 3/4 | 10 1/2 | 10 5/8 | 548900 | 5 1/8 | 791.33 | 78 |
| 95 | 3/8/95 | 11 1/2 | 11 | 11 1/4 | 732600 | 5 3/4 | 795.81 | 82 |
| 96 | 3/9/95 | 12 13.8 | 11 1/4 | 12 3/16 | 440000 | 6 11/16 | 796.24 | 89 |
| 97 | 3/10/95 | 12 1/2 | 12 1/8 | 12 1/4 | 73200 | 6 3/4 | 802.22 | 89 |
| 98 | 3/13/95 | 12 1/4 | 11 7/8 | 12 | 230200 | 6 1/2 | 802.31 | 87 |
| 99 | 3/14/95 | 12 1/8 | 11 13/16 | 11 7/8 | 107300 | 6 3/8 | 808.24 | 85 |
| 100 | 3/15/95 | 12 1/8 | 3/4 | 12 1/8 | 55900 | 6 5/8 | 807.38 | 87 |
| 101 | 3/16/95 | 12 1/4 | 11 7/8 | 12 1/4 | 94300 | 6 3/4 | 809.34 | 88 |
| 102 | 3/17/95 | 12 3/8 | 12 | 12 3/8 | 28100 | 6 7/8 | 808.33 | 89 |
| 103 | 3/20/95 | 12 1/4 | 12 | 12 | 33300 | 6 1/2 | 810.49 | 86 |
| 104 | 3/21/95 | 12 1/4 | 11 7/8 | 12 | 32000 | 6 1/2 | 809.78 | 86 |
| 105 | 3/21/95 | 12 1/8 | 11 7/8 | 12 1/8 | 32500 | 6 5/8 | 809.10 | 87 |
| 106 | 3/23/95 | 12 1/8 | 11 3/4 | 11 7/8 | 434800 | 6 3/8 | 811.39 | 85 |
| 107 | 3/24/95 | 12 1/4 | 11 3/4 | 12 1/4 | 78600 | 6 3/4 | 818.66 | 87 |
| 108 | 3/27/95 | 12 3/8 | 12 | 12 7/8 | 201900 | 6 5/8 | 822.63 | 85 |
| 109 | 3/28/95 | 12 3/8 | 12 | 12 1/4 | 55400 | 6 3/4 | 826.14 | 86 |
| 110 | 3/29/95 | 12 3/8 | 12 1/8 | 12 1/4 | 23600 | 6 3/4 | 819.16 | 87 |
| 111 | 3/30/95 | 12 3/8 | 11 7/8 | 12 1/4 | 269900 | 6 3/4 | 816.86 | 87 |
| 112 | 3/31/95 | 12 1/8 | 11 3/4 | 12 1/8 | 144900 | 6 5/8 | 817.21 | 86 |
| 113 | 4/3/95 | 12 1/4 | 11 7/8 | 12 1/4 | 7600 | 6 3/4 | 818.05 | 87 |
| 114 | 4/4/95 | 12 1/4 | 11 7/8 | 11 7/8 | 18000 | 6 3/8 | 813.72 | 85 |
| 115 | 4/5/95 | 12 | 11 3/4 | 12 | 49300 | 6 1/2 | 816.32 | 85 |
| 116 | 4/6/95 | 12 | 11 3/4 | 12 | 159200 | 6 1/2 | 813.80 | 85 |
| 117 | 4/7/95 | 13 3/8 | 11 3/4 | 12 11/16 | 515200 | 7 3/16 | 814.69 | 91 |
| 118 | 4/10/95 | 13 | 12 5/8 | 12 7/8 | 375700 | 7 3/8 | 821.26 | 91 |
| 119 | 4/11/95 | 12 15/16 | 12 1/8 | 12 3/4 | 424700 | 7 1/4 | 824.83 | 90 |
| 120 | 4/12/95 | 12 7/8 | 12 9/16 | 12 5/8 | 108900 | 7 1/8 | 828.59 | 88 |
| 121 | 4/13/95 | 14 5/8 | 12 5/8 | 14 1/2 | 555800 | 9 | 832.64 | 102 |
| 122 | 4/17/95 | 14 7/8 | 13 1/2 | 13 9/16 | 435900 | 8 1/16 | 830.82 | 95 |
| 123 | 4/18/95 | 12 5/8 | 10 7/8 | 11 1/2 | 1288900 | 6 | 825.74 | 80 |
| 124 | 4/19/95 | 11 3/8 | 10 5/8 | 10 5/8 | 240000 | 5 1/8 | 816.55 | 75 |
| 125 | 4/20/95 | 11 | 10 5/8 | 11 | 101300 | 5 1/2 | 819.01 | 77 |
| 126 | 4/21/95 | 11 | 10 5/8 | 10 7/8 | 124600 | 5 3/8 | 823.44 | 76 |
| 127 | 4/24/95 | 11 | 10 5/8 | 10 3/4 | 22800 | 5 1/4 | 828.91 | 74 |
| 128 | 4/25/95 | 11 | 10 3/4 | 10 3/4 | 92700 | 5 1/4 | 831.28 | 74 |
| 129 | 4/26/95 | 11 5/8 | 10 3/4 | 11 1/2 | 157200 | 6 | 836.91 | 79 |
| 130 | 4/27/95 | 11 5/8 | 11 1/8 | 11 1/2 | 130600 | 6 | 840.95 | 78 |
| 131 | 4/28/95 | 11 1/2 | 11 1/8 | 11 1/4 | 144200 | 5 3/4 | 843.98 | 76 |
| 132 | 5/1/95 | 11 3/8 | 11 | 11 3/8 | 109600 | 5 7/8 | 841.63 | 77 |
| 133 | 5/2/95 | 11 3/8 | 11 | 11 1/4 | 42100 | 5 3/4 | 841.79 | 76 |
| 134 | 5/3/95 | 11 1/4 | 10 7/8 | 10 7/8 | 43600 | 5 3/8 | 850.26 | 72 |
| 135 | 5/4/95 | 11 1/8 | 10 7/8 | 11 | 31300 | 5 1/2 | 846.75 | 74 |
| 136 | 5/5/95 | 11 5/8 | 10 7/8 | 11 5/8 | 178000 | 6 1/8 | 843.53 | 79 |
| 137 | 5/8/95 | 13 3/8 | 11 5/8 | 13 3/8 | 635100 | 7 7/8 | 849.29 | 91 |
| 138 | 5/9/95 | 13 5/8 | 12 1/4 | 12 1/4 | 290900 | 6 3/4 | 848.17 | 83 |
| 139 | 5/10/95 | 12 3/4 | 12 1/8 | 12 1/4 | 123700 | 6 3/4 | 847.62 | 83 |
| 140 | 5/11/95 | 12 5/8 | 12 1/8 | 12 1/4 | 201900 | 6 3/4 | 853.83 | 82 |
| 141 | 5/12/95 | 12 3/8 | 11 7/8 | 12 | 183200 | 6 1/2 | 858.94 | 80 |
| 142 | 5/15/95 | 12 1/8 | 11 1/2 | 12 1/8 | 274400 | 6 5/8 | 863.06 | 80 |
| 143 | 5/16/95 | 12 5/8 | 11 7/8 | 12 3/8 | 190600 | 6 7/8 | 868.25 | 81 |
| 144 | 5/17/95 | 12 3/8 | 11 7/8 | 12 | 188900 | 6 1/2 | 871.93 | 78 |
| 145 | 5/18/95 | 12 1/8 | 11 7/8 | 11 15/16 | 131000 | 6 7/16 | 864.06 | 78 |
| 146 | 5/19/95 | 12 | 11 1/2 | 11 5/8 | 53200 | 6 1/8 | 864.32 | 76 |
| 147 | 5/22/95 | 12 | 11 5/8 | 11 3/4 | 114300 | 6 1/4 | 871.18 | 76 |
| 148 | 5/23/95 | 12 | 11 5/8 | 11 7/8 | 98800 | 6 3/8 | 879.64 | 76 |
| 149 | 5/24/95 | 12 | 11 5/8 | 11 3/4 | 56100 | 6 1/4 | 877.98 | 75 |
| 150 | 5/25/95 | 11 7/8 | 11 1/2 | 11 7/8 | 74000 | 6 3/8 | 877.32 | 76 |
| 151 | 5/26/95 | 12 | 11 1/2 | 11 7/8 | 89200 | 6 3/8 | 871.87 | 77 |

SYQT HISTORICAL PRICES/VOLUMES, INFLATION & RELATIVE PRICE CHANGES

| t | Date | High | Low | Close | Volume | Inflation | Composite | NASDAQ |
|---|---|---|---|---|---|---|---|---|
| 152 | 5/30/95 | 11 3/4 | 11 1/4 | 11 5/8 | 94900 | 6 1/8 | 858.70 | 77 |
| 153 | 5/31/95 | 11 3/8 | 11 | 11 | 135300 | 5 1/2 | 864.58 | 71 |
| 154 | 6/1/95 | 11 3/8 | 11 | 11 1/16 | 68400 | 5 9/16 | 868.82 | 71 |
| 155 | 6/2/95 | 11 1/8 | 11 | 11 | 90200 | 5 1/2 | 872.97 | 70 |
| 156 | 6/5/95 | 12 1/4 | 11 | 12 1/8 | 238700 | 6 5/8 | 882.85 | 77 |
| 157 | 6/6/95 | 12 1/4 | 11 1/2 | 11 5/8 | 197300 | 6 1/8 | 879.40 | 74 |
| 158 | 6/7/95 | 12 1/8 | 11 1/4 | 12 1/16 | 302000 | 6 9/16 | 881.58 | 77 |
| 159 | 6/8/95 | 16 | 12 1/8 | 15 11/16 | 4050000 | 10 3/16 | 886.13 | 104 |
| 160 | 6/9/95 | 15 1/2 | 13 5/8 | 14 | 1963000 | 8 1/2 | 884.38 | 92 |
| 161 | 6/12/95 | 14 3/4 | 13 1/2 | 13 7/8 | 1164700 | 8 3/8 | 887.98 | 90 |
| 162 | 6/13/95 | 14 1/2 | 13 5/8 | 13 7/8 | 559900 | 8 3/8 | 894.23 | 89 |
| 163 | 6/14/95 | 13 3/4 | 13 3/8 | 13 1/2 | 475300 | 8 | 895.72 | 86 |
| 164 | 6/15/95 | 13 7/8 | 13 3/8 | 13 5/8 | 551400 | 8 1/8 | 902.68 | 86 |
| 165 | 6/16/95 | 14 1/2 | 13 5/8 | 14 1/8 | 1061800 | 8 5/8 | 908.65 | 89 |
| 166 | 6/19/95 | 15 1/8 | 14 1/8 | 14 5/8 | 1101000 | 9 1/8 | 922.09 | 91 |
| 167 | 6/20/95 | 16 | 14 3/4 | 15 3/4 | 1383700 | 10 1/4 | 929.83 | 99 |
| 168 | 6/21/95 | 16 | 14 5/8 | 14 3/4 | 990600 | 9 1/4 | 929.19 | 91 |
| 169 | 6/22/95 | 15 5/8 | 14 3/4 | 15 3/8 | 627300 | 9 7/8 | 940.09 | 95 |
| 170 | 6/23/95 | 15 3/8 | 14 5/8 | 14 3/4 | 241700 | 9 1/4 | 938.87 | 90 |
| 171 | 6/26/95 | 15 | 14 | 14 7/32 | 333800 | 8 23/32 | 926.98 | 88 |
| 172 | 6/27/95 | 14 7/8 | 13 1/4 | 13 1/4 | 1057600 | 7 3/4 | 919.56 | 81 |
| 173 | 6/28/95 | 13 1/2 | 12 3/4 | 12 15/16 | 631100 | 7 7/16 | 920.52 | 79 |
| 174 | 6/29/95 | 13 1/8 | 12 7/8 | 12 7/8 | 291000 | 7 3/8 | 926.81 | 77 |
| 175 | 6/30/95 | 13 1/8 | 12 7/8 | 12 7/8 | 338600 | 7 3/8 | 933.45 | 77 |
| 176 | 7/3/95 | 13 1/8 | 12 7/8 | 13 | 121600 | 7 1/2 | 934.53 | 77 |
| 177 | 7/5/95 | 13 5/8 | 13 1/8 | 13 3/8 | 300600 | 7 7/8 | 941.82 | 79 |
| 178 | 7/6/95 | 13 1/2 | 13 | 13 1/4 | 254100 | 7 3/4 | 952.93 | 77 |
| 179 | 7/7/95 | 13 1/4 | 12 3/4 | 12 7/8 | 330100 | 7 3/8 | 969.76 | 72 |
| 180 | 7/10/95 | 13 1/8 | 12 1/2 | 12 1/2 | 479100 | 7 | 976.63 | 68 |
| 181 | 7/11/95 | 12 3/4 | 12 1/4 | 12 1/2 | 217900 | 7 | 970.22 | 69 |
| 182 | 7/12/95 | 13 3/4 | 12 1/2 | 13 1/4 | 944800 | 7 3/4 | 988.63 | 72 |
| 183 | 7/13/95 | 13 1/2 | 12 7/8 | 12 7/8 | 230500 | 7 3/8 | 994.15 | 69 |
| 184 | 7/14/95 | 13 3/8 | 12 1/2 | 13 1/4 | 378800 | 7 3/4 | 999.33 | 71 |
| 185 | 7/17/95 | 13 3/8 | 13 | 13 1/8 | 181300 | 7 5/8 | 1005.89 | 69 |
| 186 | 7/18/95 | 15 1/4 | 13 1/2 | 14 3/4 | 1746000 | 9 1/4 | 988.53 | 84 |
| 187 | 7/1 9/95 | 14 3/8 | 13 3/8 | 14 | 650000 | 8 1/2 | 952.83 | 83 |
| 188 | 7/20/95 | 14 5/8 | 13 3/4 | 14 1/8 | 491200 | 8 5/8 | 960.57 | 83 |
| 189 | 7/21/95 | 15 1/4 | 14 | 14 3/4 | 733000 | 9 1/4 | 961.77 | 87 |
| 190 | 7/24/95 | 15 5/8 | 14 3/4 | 15 1/8 | 471400 | 9 5/8 | 978.57 | 88 |
| 191 | 7/25/95 | 15 3/8 | 14 7/8 | 15 | 276600 | 9 1/2 | 993.75 | 85 |
| 192 | 7/26/95 | 15 1/4 | 14 7/8 | 15 1/16 | 322300 | 9 9/16 | 1000.18 | 85 |
| 193 | 7/27/95 | 17 3/8 | 15 | 16 7/8 | 1738000 | 11 3/8 | 1010.66 | 97 |
| 194 | 7/28/95 | 17 3/4 | 16 7/8 | 17 1/8 | 1053300 | 11 5/8 | 1005.28 | 100 |
| 195 | 7/31/95 | 17 1/4 | 16 3/8 | 16 1/2 | 533000 | 11 | 1001.21 | 95 |
| 196 | 8/1/95 | 16 3/8 | 15 3/8 | 15 3/4 | 371500 | 10 1/4 | 991.11 | 91 |
| 197 | 8/2/95 | 16 7/8 | 15 3/4 | 16 | 483200 | 10 1/2 | 983.75 | 94 |
| 198 | 8/3/95 | 17 1/4 | 15 5/8 | 16 3/4 | 678600 | 11 1/4 | 982.70 | 100 |
| 199 | 8/4/95 | 17 5/8 | 16 3/4 | 17 1/8 | 621900 | 11 5/8 | 991.09 | 101 |
| 200 | 8/7/95 | 18 | 17 | 17 | 360100 | 11 1/2 | 995.22 | 100 |
| 201 | 8/8/95 | 19 5/8 | 17 1/8 | 19 1/8 | 1776000 | 13 5/8 | 997.12 | 116 |
| 202 | 8/9/95 | 19 5/8 | 18 1/2 | 18 11/16 | 553300 | 13 3/16 | 1005.10 | 112 |
| 203 | 8/10/95 | 19 | 18 1/8 | 18 1/8 | 257100 | 12 5/8 | 1000.61 | 108 |
| 204 | 8/11/95 | 18 3/8 | 17 1/2 | 17 1/2 | 274800 | 12 | 1004.11 | 103 |
| 205 | 8/1495 | 18 3/4 | 17 3/8 | 18 3/8 | 420200 | 12 7/8 | 1012.44 | 108 |
| 206 | 8/1595 | 18 3☑4 | 18 | 18 1/4 | 209100 | 12 3/4 | 1012.37 | 107 |
| 207 | 8/1695 | 18 7/8 | 18 1/8 | 18 1/8 | 248900 | 13 3/8 | 1025.75 | 110 |
| 208 | 8/17/95 | 19 5/8 | 18 5/8 | 18 7/8 | 461100 | 13 3/38 | 1029.24 | 110 |
| 209 | 8/18/95 | 19 | 18 3/8 | 18 7/8 | 495800 | 13 3/8 | 1031.28 | 110 |
| 210 | 8/21/95 | 19 1/4 | 18 | 18 1/8 | 403100 | 12 5/8 | 1019.70 | 105 |
| 211 | 8/22/95 | 18 1/4 | 17 1/2 | 17 7/8 | 423100 | 12 3/8 | 1025.29 | 103 |
| 212 | 8/23/95 | 18 | 17 1/2 | 17 7/8 | 179300 | 12 3/8 | 1028.19 | 102 |
| 213 | 8/24/95 | 18 5/8 | 17 3/8 | 18 | 372900 | 12 1/2 | 1020.93 | 104 |
| 214 | 8/25/95 | 18 1/2 | 17 5/8 | 17 5/8 | 173900 | 12 1/8 | 1019.97 | 102 |
| 215 | 8/28/95 | 17 7/8 | 16 5/8 | 16 5/8 | 368600 | 11 1/8 | 1008.15 | 95 |
| 216 | 8/29/95 | 16 3/4 | 15 3/4 | 16 5/8 | 355400 | 11 1/8 | 1003.64 | 96 |
| 217 | 8/30/95 | 17 1/8 | 16 1/2 | 16 3/4 | 231500 | 11 1/4 | 1012.61 | 96 |
| 218 | 8/31/95 | 16 7/8 | 16 1/8 | 16 1/2 | 226700 | 11 | 1020.11 | 93 |

SYQT HISTORICAL PRICES/VOLUMES, INFLATION & RELATIVE PRICE CHANGES

| t | Date | High | Low | Close | Volume | Inflation | Composite | NASDAQ |
|---|---|---|---|---|---|---|---|---|
| 219 | 9/1/95 | 17 | 16 1/4 | 16 7/8 | 216900 | 11 3/8 | 1019.47 | 96 |
| 220 | 9/5/95 | 17 1/4 | 16 3/4 | 17 | 155500 | 11 1/2 | 1039.30 | 94 |
| 221 | 9/6/95 | 17 5/8 | 17 | 17 3/8 | 235500 | 11 7/8 | 1044.28 | 96 |
| 222 | 9/7/95 | 18 1/4 | 17 1/4 | 17 3/4 | 408500 | 12 1/4 | 1051.08 | 98 |
| 223 | 9/8/95 | 18 | 17 3/8 | 17 3/8 | 181400 | 11 7/8 | 1060.03 | 94 |
| 224 | 9/11/95 | 17 1/2 | 16 5/8 | 16 5/8 | 212600 | 11 1/8 | 1066.56 | 88 |
| 225 | 9/12/95 | 17 | 16 1/4 | 16 5/16 | 164200 | 10 13/16 | 1065.00 | 86 |
| 226 | 9/13/95 | 16 5/8 | 15 3/4 | 16 1/2 | 292200 | 11 | 1067.40 | 87 |
| 227 | 9/14/95 | ·16 1/2 | 16 | 16 | 115400 | 10 1/2 | 1066.96 | 83 |
| 228 | 9/15/95 | 16 1/4 | 15 3/8 | 15 5/8 | 242700 | 10 1/8 | 1051.10 | 82 |
| 229 | 9/18/95 | 15 7/8 | 15 1/4 | 15 1/4 | 163900 | 9 3/4 | 1050.18 | 79 |
| 230 | 9/19/95 | 15 3/8 | 14 5/8 | 15 1/8 | 323800 | 9 5/8 | 1060.32 | 77 |
| 231 | 9/20/95 | 15 1/4· | 13 | 13 3/4 | 1035300 | 8 1/4 | 1065.09 | 66 |
| 232 | 9/21/95 | 13 1/2 | 12 3/4 | 13 1/2 | 638600 | 8 | 1058.51 | 65 |
| 233 | 9/22/95 | 13 3/4 | 13 | 13 1/2 | 229800 | 8 | 1053.39 | 66 |
| 234 | 9/25/95 | 13 3/4 | 13 1/4 | 13 5/8 | 216800 | 8 1/8 | 1046.15 | 68 |
| 235 | 9/26/95 | 14 | 13 1/4 | 13 1/4 | 366200 | 7 3/4 | 1038.05 | 66 |
| 236 | 9/27/95 | 13 1/8 | 12 3/8 | 13 | 197200 | 7 1/2 | 1026.54 | 65 |
| 237 | 9/28/95 | 13 7/8 | 12 7/8 | 13 3/4 | 191200 | 8 1/4 | 1047.05 | 68 |
| 238 | 9/29/95 | 13 7/8 | 13 1/8 | 13 1/4 | 187600 | 7 3/4 | 1043.54 | 65 |
| 239 | 10/2/95 | 13 1/2 | 13 | 13 1/4 | 297500 | 7 3/4 | 1027.57 | 67 |
| 240 | 10/3/95 | 13 1/4 | 12 3/8 | 13 | 296700 | 7 1/2 | 1020.45 | 66 |
| 241 | 10/4/95 | 13 | 12 5/8 | 12 11/16 | 80000 | 7 3/16 | 1002.27 | 66 |
| 242 | 10/5/95 | 13 1/4 | 12 5/8 | 13 | 279100 | 7 1/2 | 1014.20 | 67 |
| 243 | 10/6/95 | 13 1/8 | 12 1/2 | 12 3/4 | 108000 | 7 1/4 | 1012.04 | 65 |
| 244 | 10/9/95 | 12 3/4 | 12 | 12 | 88700 | 6 1/2 | 984.74 | 63 |
| 245 | 10/10/95 | 11 7/8 | 11 3/8 | 11 3/4 | 225900 | 6 1/4 | 983.47 | 62 |
| 246 | 10/11/95 | 12 1/4 | 11 7/8 | 12 | 112500 | 6 1/2 | 1001.57 | 61 |
| 247 | 10/12/95 | 12 3/8 | 12 | 12 1/16 | 60400 | 6 9/16 | 1015.63 | 60 |
| 248 | 10/13/95 | 12 1/4 | 11 | 11 1/8 | 169800 | 5 5/8 | 1018.38 | 52 |
| 249 | 10/16/95 | 11 1/4 | 10 7/8 | 11 1/8 | 241800 | 5 5/8 | 1018.13 | 52 |
| 250 | 10/17/95 | 11 3/8 | 10 7/8 | 11 1/8 | 162300 | 5 5/8 | 1035.44 | 50 |
| 251 | 10/18/95 | 11 5/8 | 11 1/8 | 11 1/4 | 352800 | 5 3/4 | 1045.13 | 50 |
| 252 | 10/19/95 | 11 3/8 | 11 1/8 | 11 3/8 | 95800 | 5 7/8 | 1046.97 | 50 |
| 253 | 10/20/95 | 11 1/4 | 10 3/4 | 11 | 106100 | 5 1/2 | 1039.44 | 49 |
| 254 | 10/23/95 | 11 1/2 | 10 13/16 | 11 1/8 | 168500 | 5 5/8 | 1036.92 | 50 |
| 255 | 10/24/95 | 11 7/8 | 11 | 11 3/4 | 221600 | 6 1/4 | 1039.24 | 54 |
| 256 | 10/25/95 | 12 3/8 | 11 3/8 | 11 1/2 | 250200 | 6 | 1026.47 | 54 |
| 257 | 10/26/95 | 11 5/8 | 10 7/8 | 11 1/4 | 186200 | 5 3/4 | 1017.57 | 53 |
| 258 | 10/27/95 | 11 1/2 | 9 5/8 | 11 | 844800 | 5 1/2 | 1025.55 | 50 |
| 259 | 10/30/95 | 11 | 10 3/8 | 10 9/16 | 192100 | 5 1/16 | 1039.69 | 45 |
| 260 | 10/31/95 | 10 5/8 | 9 3/4 | 10 | 326500 | 4 1/2 | 1036.06 | 41 |
| 261 | 11/1/95 | 10 1/4 | 9 7/8 | 9 7/8 | 229100 | 4 3/8 | 1040.50 | 40 |
| 262 | 11/2/95 | 10 1/4 | 9 7/8 | 9 7/8 | 150800 | 4 3/8 | 1057.32 | 38 |
| 263 | 11/3/95 | 10 1/8 | 9 7/8 | 9 7/8 | 113300 | 4 3/8 | 1065.66 | 37 |
| 264 | 11/6/95 | 10 1/8 | 9 7/8 | 10 | 125300 | 4 1/2 | 1062.14 | 38 |
| 265 | 11/7/95 | 10 | 9 7/8 | 10 | 96600 | 4 1/2 | 1043.90 | 40 |
| 266 | 11/8/95 | 10 | 9 7/89 | 15/16 | 140100 | 4 7/16 | 1047.94 | 39 |
| 267 | 11/9/95 | 11 1/2 | 9 7/8 | 10 1/2 | 1120500 | 5 | 1065.59 | 41 |
| 268 | 11/10/95 | 11 3/4 | 10 1/4 | 11 3/8 | 509500 | 5 7/8 | 1063.87 | 48 |
| 269 | 11/13/95 | 11 1/2 | 10 5/8 | 11 1/16 | 218900 | 5 9/16 | 1058.46 | 47 |
| 270 | 11/14/95 | 11 | 10 3/8 | 10 3/8 | 126400 | 4 7/8 | 1040.62 | 44 |
| 271 | 11/15/95 | 10 7/8 | 9 7/8 | 9 15/16 | 291400 | 4 7/16 | 1041.85 | 40 |
| 272 | 11/16/95 | 10 5/8 | 9 7/8 | 10 7/16 | 170700 | 4 15/16 | 1044.48 | 44 |
| 273 | 11/17/95 | 10 1/2 | 10 | 10 1/8 | 169700 | 4 5/8 | 1045.03 | 41 |
| 274 | 11/20/95 | 10 3/8 | 9 3/8 | 9 1/2 | 287100 | 4 | 1029.47 | 38 |
| 275 | 11/21/95 | 9 3/4 | 9 3/8 | 9 5/8 | 125200 | 4 1/8 | 1024.99 | 40 |
| 276 | 11/22/95 | 9 3/4 | 8 7/8 | 9 5/16 | 379400 | 3 13/16 | 1021.24 | 38 |
| 277 | 11/24/95 | 9 1/2 | 9 1/4 | 9 1/2 | 61800 | 4 | 1030.17 | 38 |
| 278 | 11/27/95 | 10 1/8 | 9 1/4 | 10 | 252700 | 4 1/2 | 1029.32 | 42 |
| 279 | 11/28/95 | 11 1/2 | 10 | 11 5/16 | 483300 | 5 13/16 | 1050.05 | 50 |
| 280 | 11/29/95 | 11 7/8 | 11 1/8 | 11 3/8 | 412300 | 5 7/8 | 1057.57 | 49 |
| 281 | 11/30/95 | 11 1/2 | 10 5/8 | 10 5/8 | 202000 | 5 1/8 | 1059.20 | 43 |
| 282 | 12/1/95 | 11 | 10 5/8 | 10 3/4 | 120200 | 5 1/4 | 1055.31 | 45 |
| 283 | 12/4/95 | 10 7/8 | 10 1/2 | 10 1/2 | 98700 | 5 | 1069.79 | 41 |
| 284 | 12/5/95 | 10 3/4 | 10 1/4 | 10 1/2 | 109600 | 5 | 1065.89 | 41 |
| 285 | 12/6/95 | 10 1/2 | 9 7/8 | 10 1/4 | 139800 | 4 3/4 | 1061.73 | 40 |

SYQT HISTORICAL PRICES/VOLUMES, INFLATION & RELATIVE PRICE CHANGES

| t | Date | High | Low | Close | Volume | Inflation | Composite | NASDAQ |
|---|------|------|-----|-------|--------|-----------|-----------|--------|
| 286 | 12/7/95 | 10 3/8 | 10 | 10 1/4 | 50200 | 4 3/4 | 1053.17 | 41 |
| 287 | 12/8/95 | 10 1/4 | 9 7/8 | 10 1/4 | 140800 | 4 3/4 | 1062.41 | 40 |
| 288 | 12/11/95 | 11 1/2 | 10 | 11 1/8 | 409200 | 5 5/8 | 1061.50 | 47 |
| 289 | 12/12/95 | 11 1/4 | 10 5/8 | 10 3/4 | 134500 | 5 1/4 | 1052.07 | 45 |
| 290 | 12/13/95 | 11 1/2 | 10 5/8 | 11 1/2 | 359900 | 6 | 1056.54 | 50 |
| 291 | 12/14/95 | 12 1/8 | 11 1/8 | 11 1/4 | 437000 | 5 3/4 | 1038.19 | 51 |
| 292 | 12/15/95 | 11 5/8 | 11 1/4 | 11 3/8 | 174400 | 5 7/8 | 1030.48 | 53 |
| 293 | 12/18/95 | 11 1/2 | 10 1/4 | 10 1/2 | 293000 | 5 | 1002.56 | 49 |
| 294 | 12/19/95 | 10 3/4 | 10 1/4 | 10 3/4 | 108000 | 5 1/4 | 1026.41 | 48 |
| 295 | 12/20/95 | 11 | 10 5/8 | 10 5/8 | 121000 | 5 1/8 | 1025.27 | 47 |
| 296 | 12/21/95 | 10 7/8 | 10 3/8 | 10 1/2 | 12300 | 5 | 1040.64 | 45 |
| 297 | 12/22/95 | 10 7/8 | 10 1/8 | 10 5/8 | 224300 | 5 1/8 | 1046.89 | 45 |
| 298 | 12/26/95 | 11 | 10 1/2 | 10 7/8 | 116700 | 5 3/8 | 1049.37 | 46 |
| 299 | 12/27/95 | 11 3/8 | 10 7/8 | 11 1/8 | 312600 | 5 5/8 | 1048.13 | 48 |
| 300 | 12/28/95 | 11 1/4 | 10 5/8 | 10 3/4 | 160000 | 5 1/4 | 1042.22 | 46 |
| 301 | 12/29/95 | 10 3/4 | 9 7/8 | 10 | 427800 | 4 1/2 | 1052.13 | 39 |
| 302 | 1/2/96 | 11 | 10 | 10 15/16 | 211300 | 5 7/16 | 1058.65 | 46 |
| 303 | 1/3/96 | 11 1/8 | 10 5/8 | 10 15/16 | 131700 | 5 7/16 | 1046.26 | 47 |
| 304 | 1/4/96 | 11 1/8 | 9 3/4 | 10 1/8 | 226000 | 4 5/8 | 1029.82 | 43 |
| 305 | 1/5/96 | 10 1/2 | 10 | 10 1/4 | 67800 | 4 3/4 | 1033.47 | 44 |
| 306 | 1/8/96 | 10 1/2 | 10 | 10 1/2 | 30800 | 5 | 1032.37 | 46 |
| 307 | 1/9/96 | 11 1/4 | 10 | 10 1/8 | 387500 | 4 5/8 | 998.81 | 47 |
| 308 | 1/10/96 | 10 1/8 | 9 3/4 | 10 1/8 | 147100 | 4 5/8 | 990.21 | 48 |
| 309 | 1/11/96 | 10 3/8 | 10 | 10 3/8 | 63500 | 4 7/8 | 1011.10 | 47 |
| 310 | 1/12/96 | 10 1/2 | 9 7/8 | 10 | 247500 | 4 1/2 | 1008.23 | 45 |
| 311 | 1/15/96 | 10 1/4 | 9 3/8 | 9 5/8 | 106600 | 4 1/8 | 988.57 | 45 |
| 312 | 1/16/96 | 9 5/8 | 8 3/4 | 8 7/8 | 295600 | 3 3/8 | 995.87 | 38 |
| 313 | 1/17/96 | 8 7/8 | 8 | 8 1/8 | 355300 | 2 5/8 | 998.30 | 32 |
| 314 | 1/18/96 | 8 1/4 | 6 3/4 | 7 5/8 | 611700 | 2 1/8 | 1007.24 | 27 |
| 315 | 1/19/96 | 8 | 7 5/8 | 7 31/32 | 149300 | 2 15/32 | 1018.45 | 28 |
| 316 | 1/22/96 | 9 | 7 7/8 | 8 3/8 | 288300 | 2 7/8 | 1029.44 | 30 |
| 317 | 1/23/96 | 8 3/4 | 8 1/8 | 8 1/8 | 154000 | 2 5/8 | 1028.04 | 28 |
| 318 | 1/24/96 | 8 7/32 | 7 1/8 | 7 13/16 | 467700 | 2 5/16 | 1043.46 | 24 |
| 319 | 1/25/96 | 8 | 7 5/8 | 7 3/4 | 226700 | 2 1/4 | 1035.95 | 24 |
| 320 | 1/26/96 | 7 7/8 | 7 1/2 | 7 3/4 | 150400 | 2 1/4 | 1040.96 | 24 |
| 321 | 1/29/96 | 8 | 7 3/8 | 8 | 229600 | 2 1/2 | 10042.51 | 25 |
| 322 | 1/30/96 | 8 1/8 | 7 3/4 | 7 3/4 | 83000 | 2 1/4 | 1051.30 | 22 |
| 323 | 1/31/96 | 8 | 7 1/2 | 7 5/8 | 127000 | 2 1/8 | 1059.79 | 20 |
| 324 | 2/1/96 | 7 3/4 | 7 3/4 | 7 3/4 | 270900 | 2 1/4 | 1069.46 | 20 |
| 325 | 2/2/96 | 5 3/4 | 4 7/8 | 5 1/2 | 2642000 | 0 | 1072.112 | 2 |
| 326 | 2/5/96 | 5 7/8 | 5 1/8 | 5 1/8 | 508900 | 0 | 1083.34 | |
| 327 | 2/6/96 | 5 3/8 | 5 | 5 5/32 | 486300 | 0 | 1089.08 | |
| 328 | 2/7/96 | 5 3/8 | 5 | 5 1/16 | 294900 | 0 | 1084.88 | |
| 329 | 2/8/96 | 5 1/4 | 5 | 5 1/16 | 311700 | 0 | 1093.17 | |
| 330 | 2/9/96 | 5 1/8 | 5 | 5 1/16 | 345200 | 0 | 1094.60 | |
| 331 | 2/12/96 | 5 1/8 | 4 15/16 | 5 1/16 | 258700 | 0 | 1095.38 | |
| 332 | 2/13/96 | 5 1/16 | 4 15/16 | 4 15/16 | 66400 | 0 | 1087.22 | |
| 333 | 2/14/96 | 5 1/16 | 4 7/8 | 5 | 195000 | 0 | 1088.03 | |
| 334 | 2/15/96 | 5 1/4 | 4 15/16 | 5 1/8 | 281800 | 0 | 1090.54 | |
| 335 | 2/16/96 | 5 1/4 | 5 | 5 1/4 | 205800 | 0 | 1090.71 | |
| 336 | 2/20/96 | 5 1/2 | 5 1/8 | 5 1/2 | 151900 | 0 | 1083.24 | |
| 337 | 2/21/96 | 6 3/8 | 5 1/2 | 6 1/8 | 571200 | 0 | 1096.85 | |
| 338 | 2/22/96 | 7 5/8 | 6 3/16 | 7 1/2 | 844800 | 0 | 1117.11 | |
| 339 | 2/23/96 | 7 3/4 | 6 3/4 | 7 1/8 | 621800 | 0 | 1117.79 | |
| 340 | 2/26/96 | 7 11/16 | 7 1/8 | 7 3/8 | 372800 | 0 | 1113.05 | |
| 341 | 2/27/96 | 7 1/2 | 7 3/16 | 7 3/8 | 166100 | 0 | 1106.17 | |
| 342 | 2/28/96 | 7 13/32 | 6 23/32 | 6 23/32 | 335400 | 0 | 1107.55 | |
| 343 | 2/29/96 | 6 13/16 | 6 | 6 1/8 | 331300 | 0 | 1100.05 | |
| 344 | 3/1/96 | 6 3/16 | 5 3/4 | 5 7/8 | 160600 | 0 | 1086.08 | |
| 345 | 3/4/96 | 6 1/4 | 5 15/16 | 6 1/8 | 95900 | 0 | 1084.88 | |
| 346 | 3/5/96 | 6 1/4 | 6 | 6 | 51700 | 0 | 1096.81 | |
| 347 | 3/6/96 | 6 1/8 | 5 7/8 | 6 | 91400 | 0 | 1091.82 | |
| 348 | 3/7/96 | 6 1/16 | 5 15/16 | 5 15/16 | 118500 | 0 | 1093.12 | |
| 349 | 3/8/96 | 5 15/16 | 5 5/8 | 5 3/4 | 101000 | 0 | 1063.73 | |
| 350 | 3/11/96 | 5 15/16 | 5 11/16 | 5 13/16 | 78600 | 0 | 1080.50 | |
| 351 | 3/12/96 | 6 7/8 | 5 3/4 | 6 1/2 | 393000 | 0 | 1073.05 | |
| 352 | 3/13/96 | 6 3/4 | 6 1/2 | 6 23/32 | 143800 | 0 | 1088.64 | |

SYQT HISTORICAL PRICES/VOLUMES, INFLATION & RELATIVE PRICE CHANGES

| t | Date | High | Low | Close | Volume | Inflation | Composite | NASDAQ |
|---|---|---|---|---|---|---|---|---|
| 353 | 3/14/96 | 6 3/4 | 6 3/8 | 6 1/2 | 121100 | 0 | 1091.07 | |
| 354 | 3/15/96 | 6 1/2 | 6 1/4 | 6 1/4 | 88500 | 0 | 1099.59 | |
| 363 | 3/28/96 | 5 9/16 | 5 1/16 | 51/8 | 321100 | 0 | 1094.83 | |
| 365 | 4/1/96 | 6 3/32 | 5 1/2 | 5 11/16 | 136900 | 0 | 1106.57 | |
| 366 | 4/2/96 | 5 3/4 | 5 5/8 | 5 11/16 | 32500 | 0 | 1111.29 | |
| 367 | 4/3/96 | 6 1/8 | 5 11/16 | 6 1/8 | 220700 | 0 | 1115.85 | |
| 368 | 4/4/96 | 6 3/8 | 6 1/8 | 6 5/16 | 119900 | 0 | 1118.21 | |
| 369 | 4/8/96 | 6 1/8 | 5 7/8 | 6 1/16 | 92600 | 0 | 1105.66 | |
| 370 | 4/9/96 | 6 1/16 | 5 11/16 | 5 7/8 | 141600 | 0 | 1109.15 | |
| 371 | 4/10/96 | 6 1/2 | 5 5/8 | 6 3/16 | 270600 | 0 | 1105.28 | |
| 372 | 4/11/96 | 6 3/16 | 5 7/8 | 6 | 84200 | 0 | 1097.14 | |
| 373 | 4/12/96 | 6 1/8 | 5 3/4 | 5 7/8 | 139500 | 0 | 1100.94 | |
| 374 | 4/15/96 | 6 1/4 | 5 3/4 | 6 3/16 | 214800 | 0 | 1110.44 | |
| 375 | 4/16/96 | 6 1/2 | 6 1/16 | 6 3/16 | 239400 | 0 | 1124.92 | |
| 376 | 4/17/96 | 6 5/16 | 5 3/4 | 5 29/32 | 117800 | 0 | 1120.87 | |
| 377 | 4/18/96 | 6 | 5 3☑ | 5 7/8 | 44300 | 0 | 1136.30 | |
| 378 | 4/19/96 | 5 15/16 | 5 9/16 | 5 9/16 | 193800 | 0 | 1138.70 | |
| 379 | 4/22/96 | 5 15/16 | 5 5/8 | 5 3/4 | 135700 | 0 | 1153.50 | |
| 380 | 4/23/96 | 5 15/16 | 5 11/16 | 5 3/4 | 253800 | 0 | 1166.76 | |
| 381 | 4/24/96 | 6 3/4 | 5 13/16 | 6 7/16 | 536500 | 0 | 1176.83 | |
| 382 | 4/25/96 | 6 3/4 | 6 3/8 | 6 9/16 | 532400 | 0 | 1184.17 | |
| 383 | 4/26/96 | 6 5/8 | 5 29/32 | 6 5/32 | 362100 | 0 | 1186.89 | |
| 384 | 4/29/96 | 6 3/16 | 5 7/8 | 6 | 122500 | 0 | 1188.20 | |
| 385 | 4/30/96 | 6 7/16 | 5 15/16 | 6 7/16 | 220000 | 0 | 1190.52 | |
| 386 | 5/1/96 | 6 7/16 | 6 1/16 | 6 1/4 | 195700 | 0 | 1199.66 | |
| 387 | 5/2/96 | 6 1/4 | 5 15/16 | 5 15/16 | 279900 | 0 | 1178.33 | |
| 388 | 5/3/96 | 6 1/16 | 5 15/16 | 6 | 159400 | 0 | 1184.60 | |
| 389 | 5/6/96 | 6 | 5 9/16 | 5 11/16 | 309100 | 0 | 1186.31 | |
| 390 | 5/7/96 | 5 3/4 | 5 1/2 | 5 5/8 | 226900 | 0 | 1182.67 | |
| 391 | 5/8/96 | 5 9/16 | 4 3/8 | 4 7/8 | ·1606800 | 0 | 1183.43 | |
| 392 | 5/9/96 | 5 1/4 | 4 13/16 | 4 15/16 | 930500 | 0 | 1187.82 | |
| 393 | 5/10/96 | 4 15/16 | 4 13/16 | 4 15/16 | 332900 | 0 | 1202.76 | |
| 394 | 5/13/96 | 5 | 4 7/8 | 5 | 224800 | 0 | 1221.87 | |
| 395 | 5/14/96 | 5 1/8 | 4 7/8 | 5 | 263900 | 0 | 1234.49 | |
| 396 | 5/15/96 | 5 | 4 7/8 | 4 29/32 | 260700 | 0 | 1233.56 | |
| 397 | 5/16/96 | 5 15/16 | 4 7/8 | 5 11/16 | 870400 | 0 | 1239.31 | |
| 398 | 5/17/96 | 6 1/16 | 5 1/2 | 6 1/16 | 599800 | 0 | 1241.88 | |
| 399 | 5/20/96 | 9 1/2 | 6 | 9 1/2 | 2529000 | 0 | 1248.11 | |
| 400 | 5/21/96 | 12 7/8 | 9 1/2 | 11 5/8 | 9553000 | 0 | 1244.42 | |
| 401 | 5/22/96 | 14 5/8 | 12 | 14 5/8 | 10059000 | 0 | 1247.38 | |
| 402 | 5/23/96 | 18 7/8 | 16 1/8 | 17 7/8 | 14315000 | 0 | 1248.65 | |
| 403 | 5/24/96 | 15 5/8 | 10 1/2 | 10 7/8 | 13925000 | 0 | 1247.80 | |
| 404 | 5/28/96 | 10 3/8 | 8 3/8 | 9 3/8 | 4469000 | 0 | 1236.30 | |
| 405 | 5/29/96 | 11 1/4 | 8 5/8 | 9 7/8 | 2157000 | 0 | 1225.63 | |
| 406 | 5/30/96 | 11 5/8 | 10 1/8 | 10 3/4 | 2527000 | 0 | 1233.48 | |
| 407 | 5/31/96 | 11 7/8 | 10 3/4 | 11 | 1071400 | 0 | 1243.43 | |
| 408 | 6/3/96 | 14 7/8 | 12 3/8 | 14 3/4 | 7255000 | 0 | 1238.73 | |
| 409 | 6/4/96 | 16 3/4 | 13 3/8 | 13 41/64 | 8171000 | 0 | 1243.68 | |
| 410 | 6/5/96 | 13 5/8 | 7 1/4 | 8 7/8 | 7246000 | 0 | 1249.95 | |
| 411 | 6/6/96 | 11 1/2 | 9 1/8 | 10 | 5346000 | 0 | 1232.52 | |
| 412 | 6/7/96 | 11 1/4 | 9 1/2 | 10 5/8 | 1710000 | 0 | 1229.76 | |
| ·413 | 6/10/96 | 11 1/2 | 10 3/8 | 10 3/8 | 1244900 | 0 | 1230.04 | |
| 414 | 6/11/96 | 101/2 | 9 5/8 | 9 7/8 | 1375100 | 0 | 1230.76 | |
| 415 | 6/12/96 | 10 1/8 | 9 1/2 | 9 7/8 | 570300 | 0 | 1235.47 | |
| 416 | 6/13/96 | 9 5/8 | 8 7/8 | 9 1/16 | 1094000 | 0 | 122.65 | |
| 417 | 6/14/96 | 10 1/8 | 9 | 9 3/8 | 714800 | 0 | 1213.18 | |
| 418 | 6/17/96 | 11 3/8 | 9 3/4 | 11 1/4 | 2544000 | 0 | 1207.84 | |
| 419 | 6/18/96 | 11 1/18 | 10 1/8 | 10 1/8 | 1365400 | 0 | 1183.08 | |
| 420 | 6/19/96 | 10 1/4 | 9 3/4 | 9 3/4 | 601400 | 0 | 1179.27 | |
| 421 | 6/20/96 | 9 7/8 | 9 3/16 | 9 7/16 | 526600 | 0 | 1167.43 | |
| 422 | 6/21/96 | 9 7/16 | 9 1/8 | 9 3/8 | 278800 | 0 | 1175.44 | |
| 423 | 6/24/96 | 9 3/8 | 8 1/2 | 8 5/8 | 580200 | 0 | 1182.90 | |